## CABLEVISION SYSTEMS DEVELOPMENT COMPANY

v.

## MOTION PICTURE ASSOCIATION OF AMERICA, INC., et al., Appellants,

## U.S. Copyright Office and its Register.

### Nos. 86–5552 to 86–5554, 86–5597 and 86–5635 to 86–5637.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 15, 1987.

Decided Jan. 5, 1988.

---

Stuart H. Newberger, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Dorothy Schrader, Gen. Counsel, U.S. Copyright Office, Royce C. Lamberth and Michael J. Ryan, Asst. U.S. Attys., Washington, D.C., were on brief, for federal appellants/cross-appellees.

Richard M. Cooper, with whom Edward Bennett Williams, Robert W. Hamilton, Paul Mogin, Arthur Scheiner and Dennis Lane, Washington, D.C., were on brief, for appellants/cross-appellees, Motion Picture Ass'n of America, Inc., et al.

Jay E. Ricks, with whom David J. Saylor, Gardner F. Gillespie, Steven J. Horvitz and Brenda L. Fox, Washington, D.C., were on brief, for appellee, Nat. Cable Television Ass'n, Inc. Michael S. Schooler, Washington, D.C., also entered an appearance for appellee, Nat. Cable Television Ass'n, Inc.

Mark J. Tauber and Michael A. Schlanger, with whom Deborah C. Costlow and Nora E. Garrote, Washington, D.C., were on brief for appellee/cross-appellant, Cablevision Co.

Philip R. Hochberg, Washington, D.C., for Nat. Basketball Ass'n and Nat. Hockey League, Ritchie T. Thomas and Judith Jurin Semo, Washington, D.C., for Nat. Collegiate Athletic Ass'n, David H. Lloyd, Robert Alan Garrett, Terri A. Southwick, and Edwin M. Durso, Washington, D.C., for Major League Baseball, Victor E. Ferrall, Jr. and John I. Stewart, Jr., Washington, D.C., for Nat. Ass'n of Broadcasters, Bernard Korman and I. Fred Koenigsberg, Washington, D.C., for American Soc. of Composers, Authors and Publishers, Charles T. Duncan and Michael Faber, Washington, D.C., for Broadcast Music, Inc., Nicholas Arcomano for SESAC, Inc., Gene A. Bechtel, Washington, D.C., for Public Broadcasting Service, Jamie S. Gorelick, Washington, D.C., for Nat. Public Radio, John H. Midlen, Jr., Washington, D.C., for Old–Time Gospel Hour, and Douglas G. Thompson, Jr., Washington, D.C., for Canadian Broadcasting Corp., were on the brief for amici curiae, Nat. Basketball Ass'n, et al.

Robert W. Coll, Washington, D.C., also entered an appearance for amici curiae, National Hockey League.

Before ROBINSON, RUTH BADER GINSBURG and SILBERMAN, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

The Copyright Act of 1976, 17 U.S.C. §§ 101 *et seq.* (1982 & Supp. IV 1986), grants cable television systems a license to retransmit copyrighted broadcast[1] programming to their subscribers, *id.* § 111(c)(1), and requires in return that the systems deposit with the Copyright Office a fee equal to a "specified percentage[ ] of the gross receipts from subscribers to the cable service ... for the basic service of providing secondary transmissions of primary broadcast transmitters," *id.* § 111(d)(1)(B).[2] In a series of complaints consolidated for trial, a trade association representing the cable television industry and Cablevision, an individual cable company, sued several copyright owners seeking a declaration of the meaning of the above-quoted language. The copyright owners filed counterclaims against Cablevision for copyright infringement, alleging that Cablevision's interpretation of the statutory phrase led to an underpayment of the required fee and thus made the company an infringer. On the district court's order, the trade association joined the Copyright Office as a defendant.

On cross motions for summary judgment, the district court rejected the Copyright Office's interpretation of the statute—that gross receipts "include the full amount of monthly (or other periodic) service fees for any and all services or tiers of services which include one or more secondary transmissions of television or radio broadcast signals," 37 C.F.R. § 201.17(b)(1) (1987)—as inconsistent with congressional intent and endorsed instead the position of the trade association. *Cablevision Co. v. Motion Picture Ass'n of Am.*, 641 F.Supp. 1154, 1161 (D.D.C.1986). The court ordered the Copyright Office to modify its regulation to accord with the court's perception of congressional intent. The district court then dismissed the counterclaims for infringement on grounds that there had been no violation of "the spirit of the law." *Id.* at 1163. The copyright own-

---

1. Throughout this opinion, a "broadcast" program is one originally propagated by traditional over-the-air television signals for receipt by antenna, and a "cable-originated" or "non-broadcast" program is one produced solely for cable systems and disseminated only through them. "Transmission" is a general term denoting any means of delivering programming. Thus, a broadcast program could be retransmitted over cable.

2. In 1986, Congress amended 17 U.S.C. § 111(d) by eliminating old § 111(d)(1) and redesignating accordingly. Pub.L. No. 99–397, § 2(a). The subsection at issue here, new § 111(d)(1), appears as § 111(d)(2) in the district court's opinion.

ers, the Copyright Office, and Cablevision appeal, putting forward a wide variety of arguments for reversal or modification of the district court's order. We hold that the Copyright Office has the authority to issue regulations interpreting the statutory language at issue and that its interpretation was a reasonable one. We agree with the district court's rejection of Cablevision's reading of the statutory term "basic service," but hold that the district court erred in declining to defer to the Copyright Office's regulation as to what revenues make up "gross receipts." We also reverse and remand for further proceedings regarding the counterclaims. The basis for the district court's dismissal is unclear, and the record before us is insufficient to allow us to rule as a matter of law on whether infringement occurred.

## I.

This case presents a dispute over the structure of a statutory fee that cable television operators must pay for the right to retransmit broadcast television programming. Those who pay the fee, the cable systems, advocate a construction that the eventual recipients of the fee, the copyright owners, find objectionable. The dispute arose because, after governmental intervention designed to correct a market imperfection, the market evolved in unanticipated directions. The disagreement has its roots in two Supreme Court decisions, *Teleprompter Corp. v. Columbia Broadcasting System*, 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974), and *Fortnightly Corp. v. United Artists Television*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), that held retransmissions by cable television systems of broadcast programming, whether of local or distant origin, did not constitute "performances" under the copyright law and thus did not give rise to liability for infringement. The *Teleprompter* Court concluded that if the Copyright Act of 1909 was inadequate to govern the commercial relationships that had emerged in the interim, it was for

Congress to create a substitute. 415 U.S. at 414, 94 S.Ct. at 1141.

Thus prompted, Congress, as part of its revision of the copyright laws, addressed in particular this problem of "secondary transmissions." When a cable system takes a broadcast signal ("primary transmission") and delivers it to the system's subscribers ("secondary transmission"), the system is earning money by selling to its customers the copyrighted material licensed only for the primary broadcast transmission. Under *Fortnightly* and *Teleprompter*, the copyright owner was unable to share directly in those revenues. Congress was of the view that the copyright holders should receive direct compensation for the use of their rights. But Congress also recognized that the transaction costs accompanying the usual scheme of private negotiation that controls the use of copyrighted materials could be prohibitively high. H.R.REP. No. 1476, 94th Cong., 2d Sess. 89, *reprinted in* 1976 U.S. CODE CONG. & ADMIN.NEWS 5659, 5704. The operator of a small cable system in a rural area, for instance, might find it more profitable to forgo rebroadcasting a wide variety of signals rather than to negotiate with various copyright owners in Atlanta, Chicago, and Los Angeles; cable operators, subscribers, and copyright holders would all be worse off under such circumstances than in a world where the retransmission rights could change hands at a lower cost. Congress saw that neither the situation as it existed after *Fortnightly* and *Teleprompter* nor a replication of classic copyright arrangements would be entirely satisfactory.

The response was a new regime, embodied in section 111 of the revised Act. Congress first abandoned the notion of individual negotiation in favor of a compulsory license. Under § 111(c) of the Act, a cable system may retransmit to its customers any primary transmission made by a broadcast station licensed by the Federal Communications Commission.[3] In exchange for

---

**3.** *I.e.,* the familiar network and local programming that can be received with an antenna.

The words "station" and "channel" are synonymous for purposes of this opinion and refer to

this privilege, however, the cable systems are required to pay a fee, to be distributed to the copyright owners as surrogate for the royalties for which they might have negotiated under a pure market scheme.

In devising that fee, Congress drew a crucial distinction between local and distant broadcast signals. The House Judiciary Committee observed that "there was no evidence that the retransmission of 'local' broadcast signals ... threatens the existing market for copyright program owners." H.R.REP. NO. 94–1476, *supra,* at 90, 1976 U.S.CODE CONG. & ADMIN.NEWS 5704. Because local[4] retransmission does not carry the signal to households beyond those local advertisers would be willing to pay to reach, the advertising revenue base will be increased by any expansion of the scope of the dissemination due to the retransmission, and copyright owners will be able to negotiate with the broadcaster to receive appropriate compensation. By the same token, the retransmission of network signals, from whatever distance, causes no difficulty. Advertisers on national network television—such as CBS—expect to reach audiences nationwide and pay accordingly. Because national advertisers will pay to reach any incremental viewers, networks will be willing and able to pay copyright holders the full value placed on the receipt of the program by viewers (as measured by the willingness of advertisers to buy time during the program). *Id.* Distant non-network programming is altogether another matter. Local advertisers will not pay extra to reach viewers who cannot reasonably be expected to patronize their businesses, so the revenue base from which to compensate the owners understates the value of the use of the materials, and the

copyright holders would, absent an adjustment mechanism, be undercompensated. *Id.; see also National Cable Television Ass'n v. Copyright Royalty Tribunal,* 689 F.2d 1077, 1079 (D.C.Cir.1982). The Act therefore allows the copyright owners of *distant non-network programs* to receive a portion of the fees paid to the cable systems by subscribers. 17 U.S.C. § 111(d)(3)(A).

Congress' broad purpose was thus to approximate ideal market conditions more closely than would either the *Teleprompter* or individual negotiation models; the compulsory license would allow the retransmission of signals for which cable systems would not negotiate because of high transaction costs, and the owners of copyrights for non-network programs carried on cable systems far from the original area of broadcast—who could not receive full value out of advertising revenues—would receive compensation out of the fees paid by the systems.

The disputed fee computation comprises two parts and is deceptively simple in principle. The cable system first calculates "the gross receipts from subscribers to the cable service during [the applicable] period for the basic service of providing secondary transmissions of primary broadcast transmitters." 17 U.S.C. § 111(d)(1)(B). By using one of three formulas, selected according to the amount of gross receipts, the system then determines what percentage of gross receipts is due as a fee.

For larger cable systems, the percentage of gross receipts owed depends upon the number of *distant signal equivalents* ("DSEs") carried by the system.[5] The DSE

---

an entity that transmits by broadcast or cable a single regular schedule of programming. For example, a local affiliate of a network is a station or channel, as is a cable-originated entity such as ESPN that offers a single complete bill of fare.

**4.** The technical definition of local, which appears at 17 U.S.C. § 111(f), is not at issue in this case. For conceptual purposes, a signal is "local," as opposed to "distant," if the subscribers of a particular cable system can receive the broadcast signal with an antenna. *See, e.g.,*

*Teleprompter,* 415 U.S. at 401 & n. 7, 94 S.Ct. at 1134 & n. 7.

**5.** Congress was concerned about the potential impact of the fees on smaller systems, especially since many such systems must carry more distant signals to compensate for sparse local broadcasting, and therefore provided them special relief. *See* H.R.REP. NO. 1476, *supra,* at 96–97; S.REP. NO. 473, 94th Cong., 1st Sess. 81 (1975). Systems with semiannual gross receipts of $75,800 or less pay a flat fee of $28. Systems with semiannual gross receipts of more than

figure is calculated by assigning a value of 1.0 to each distant independent station carried and 0.25 to each distant network station or distant noncommercial educational station, and summing. *Id.* § 111(f). The lower value is assigned to distant network affiliates because the bulk of their programming is provided by the networks and, as described above, copyright owners of network broadcasts are presumed to be fully compensated out of revenues from advertisers seeking to reach the national market. The fee owed rises by a certain percentage of gross receipts—which percentage, established by regulation, declines as the number of DSEs rises—for each incremental DSE. *See id.* § 111(d)(1)(B); 37 C.F.R. § 308.2(a).[6] Thus, a large (gross receipts greater than $292,000) cable system that carried one distant signal equivalent would pay 0.893% of gross receipts, a comparable system with a DSE of 2.0 would pay 1.456%, and a similar system with a DSE of 5.0 would pay 2.847%. A system with a DSE of less than one, however, would also pay 0.893%. 37 C.F.R. § 308.2(a)(1); *see also* H.R.REP. No. 94–1476, *supra,* at 96. The Act does not require perfect correlation between the number of distant signals retransmitted and the fee paid, but it operates roughly to charge systems according to the number of distant signals they use. *See supra* note 5 (small systems pay regardless of signal use). Finally, the fees are distributed to the designated copyright owners by the Copyright Royalty Tribunal ("CRT"), a body created by the Copyright Act to administer certain of its provisions.[7]

The foregoing description of the operation of section 111 is common ground for the parties. The dispute centers on the definition of "gross receipts ... for the basic service of providing secondary transmissions," the base amount from which the fee is calculated and on which depends the size of the fund the CRT distributes. Congress did not define "gross receipts" or "basic service" in the 1976 Copyright Act, but an examination of the reports on the legislation evokes a fairly sharp image of the model that Congress had in mind at the time of enactment. According to that picture, the cable subscriber had available from the system a single package for a flat fee containing a number of retransmitted broadcast signals and some channels produced just for cable—the "basic service" that every subscriber received—and beyond that, individually priced specialty channels available only on cable from which the subscriber to the basic service could pick and choose—"pay cable." *See, e.g.,* H.R. REP. No. 94–1476, *supra,* at 88.[8] In this paradigmatic case, the definition of gross receipts from basic service was simple; gross receipts were the flat fee for the initial package multiplied by the number of

$75,800 but less than $292,000 pay a fee based on set percentages of gross receipts without regard to DSEs. *See* 17 U.S.C. § 111(d)(1)(C), (D); 37 C.F.R. § 308.2(b).

**6.** The declining proportion of gross receipts added to the fee for each additional DSE is appropriate since, *ceteris paribus,* the revenues of a *large* system, *see supra* note 5, could be expected to rise with each new signal. The mechanism provides for a more uniform dollar-per-subscriber-per-signal fee.

**7.** 17 U.S.C. § 801. The CRT performs two main tasks relevant here. The first is the quasi-judicial function of distributing among copyright owners the fees paid to the Copyright Office under section 111, thus completing the statutory substitute for market transactions. *Id.* § 801(b)(3); *see also id.* § 111(d)(3), (4). Second, the CRT has the quasi-legislative responsibility to adjust the fee rates to reflect inflation or cable system subscription rate changes in

order to maintain the real per-subscriber royalty fee which existed at the date of enactment. *Id.* § 801(b)(2)(A). The CRT also has the power to adjust overall rates to maintain reasonableness in the light of FCC rule changes. 17 U.S.C. § 801(b)(2)(B), (C). The CRT has no responsibility or authority to define gross receipts or otherwise to determine the relative share of the total fund to be contributed by individual cable systems. *See* 17 U.S.C. § 803(a).

**8.** The legislative history does not make it absolutely clear whether Congress understood the term pay cable to encompass only individually priced non-broadcast stations—the usual content of the term, *see Home Box Office, Inc. v. FCC,* 567 F.2d 9, 18 & n. 8 (D.C.Cir.), *cert. denied,* 434 U.S. 829, 98 S.Ct. 111, 54 L.Ed.2d 89 (1977)—or to include the possibility of a package of several cable-originated channels offered for one price. As the remainder of this opinion will indicate, we need not reach the question and therefore leave it unanswered.

subscribers. It was clear from the outset that receipts for pay cable and other charges unrelated to programming, such as those for installation, were not to be a part of gross receipts, *see* H.R. REP. NO. 94–1476, *supra*, at 96, and that proposition is undisputed before us. Primarily because of technological constraints, the initial package consisted largely of the retransmission of local broadcast signals and of certain rather rudimentary cable-originated programming—mostly automated time, weather, and news services and access channels available to local citizens as an outlet for speech, *see* 47 C.F.R. § 76.254 (1976). As a rule, such cable-originated services were not greatly prized by subscribers and whether they were included in the gross receipts pool was a matter of negligible concern.

Evolution of the cable industry and its marketing practices rather quickly made the meaning of gross receipts problematic, however, as reality diverged from the model on which the Act was based. As improvements in terrestrial technology gave cable systems increased channel capacity, advanced satellite services allowed cable transmissions to be offered nationwide. These developments ushered in such familiar and popular cable-originated stations as ESPN and CNN and made possible the development of "superstations," stations broadcast in one location but carried nationwide by cable, such as WTBS from Atlanta and WGN from Chicago.[9] Because the initial package offered to subscribers might now contain, for one price, local broadcast programming, distant broadcast programming (*e.g.*, WTBS), and highly desirable cable-originated programming (*e.g.*, ESPN), the question arose whether cable companies could allocate part of the initial package's subscription price to cable-origi-

nated programming and exclude that amount from gross receipts. Changes in the marketing of cable services added to the confusion. The practice of selling a single initial package plus individually priced pay cable stations gave way to tiering: the offering of several different packages, or tiers, of stations, with each tier separately priced.[10] And each tier might contain both broadcast and cable-originated stations. The question soon arose of whether entire tiers could be excluded from gross receipts as well as whether it was permissible to exclude revenues from non-broadcast channels within a "mixed" tier that contained both broadcast and non-broadcast channels. Because the congressional debates centered on a model of the cable industry that omitted such complexities, no obvious answers were available.

We thus arrive at the crux of this case—whether revenues from all tiers other than pay cable and from all channels within each included tier must be included in gross receipts. The cable companies argue that, since the statute was not meant to reimburse the copyright owners of *non-broadcast* programming, and since advertisers buy time on cable-originated stations that are carried nationwide such as CNN and ESPN just as they do on the broadcast networks, with the desire to address the entire audience actually reached, there can be no reason to include receipts for subscriptions to cable-originated channels in a fund designed to reimburse the owners of copyrights on distant *broadcast* programming. Therefore, the cable companies reason, revenues from non-broadcast channels or tiers that do not resemble the initial package envisioned by Congress should not be included in gross receipts.

---

**9.** As advertisers recognize that the superstations reach national audiences, one would expect the charges for advertising time to rise, allowing copyright owners to negotiate appropriate royalty fees from superstations as they do from networks. The statutory scheme could thus become superfluous for perhaps the most important category of distant broadcast programming. *See Operators Rate WTBS, ESPN Most Valuable Basic Services,* Multichannel News, July 4, 1983, at 1 (listing superstation WTBS as one of the

most lucrative cable properties other than pay cable).

**10.** For example, tier 1 could offer four local broadcast stations and an automated weather service plus ESPN and WTBS for $6, tier 2 could carry WGN and CNN for $3, and tier 3 could carry eight more cable-originated channels for $5.

The germ of a regulatory answer to these contentions appeared in 1978 in a revision of the Copyright Office's regulations implementing section 111. Those regulations emphasized that gross receipts included "the full amount of monthly (or other periodic) service fees," 43 Fed.Reg. 27,827, 27,832 (1978). The preamble explained that systems that furnished to subscribers "for a single monthly fee, a service that includes retransmission of radio and television signals and local origination (*such as time and weather and automated news services*)," *id.* at 27,828 (emphasis added), could not allocate a portion of the fee to the local origination services (and thereafter exclude that portion from gross receipts) because the Copyright Office could find "no statutory justification or basis for allocating" the fee. *Id.* The Office thus determined early on, albeit without considering the case of more valuable non-broadcast properties such as ESPN, that intra-tier allocation was impermissible.

In response to changes in the cable industry, and, most important for our purposes, to comments from cable system operators that a review of the definition of gross receipts was desirable, the Copyright Office undertook an exhaustive reevaluation of its regulations in 1981. 46 Fed.Reg. 30,649, 30,650 (1981). Among other items, it proposed to examine whether gross receipts from a particular tier could be prorated when that tier contained non-broadcast components and whether a system that offered tiered service should be required to include any, all, or part of revenues from tiers not received by all subscribers in gross receipts from basic service. *Id.* at 30,651.

In the public hearing, Robert W. Ross, Vice President for Legal Affairs and Government Relations of the National Cable Television Association ("NCTA"), a trade association for cable system operators, admitted that attempts to prorate revenues among channels offered on the same tier "would add an undue complication to the process, and might well be a subject for substantial litigation and dispute.... [Attempting proration] is not the position that reflects the attitude of the Association.... I think you could create a regulatory monster...." Hearings of July 28, 1981, Joint Appendix at 325–27. The resulting regulation issued some time later, in April of 1984. 49 Fed.Reg. 13,029 (1984). No doubt influenced in part by the NCTA's position, the regulation provides that "[g]ross receipts for the 'basic service of providing secondary transmissions of primary broadcast transmitters' include the full amount of monthly (or other periodic) service fees for any and all services or tiers of services which include one or more secondary transmissions of television or radio broadcast signals." 37 C.F.R. § 201.17(b)(1). In short, if a tier contains a broadcast signal, all subscription revenues from the tier are to be included in gross receipts.

This lawsuit cannot accurately be styled solely a challenge to that interpretation, for the first complaint was filed almost one year before the regulation took effect. Cablevision, a New York cable system operator, sought a declaratory judgment regarding the proper definition of gross receipts from basic service. Cablevision had since 1979, when it moved distant broadcast programming from the initial tier those channels occupied with local broadcast programming to an optional, higher tier, interpreted the term to include only those monies received for subscriptions to the first, or lowest, tier to which all customers were required to subscribe before electing higher tiers. Cablevision argued that its interpretation was correct because its definition of "basic service" comported with trade usage of the term and a consistent line of FCC and congressional use.[11]

The defendants to that declaratory action, the Motion Picture Association of America and eight of its member companies ("Copyright Owners") filed counterclaims charging Cablevision with copyright infringement under section 111 for retran-

**11.** Cablevision later filed a second complaint on behalf of three of its other systems that engaged in the same reporting practices.

smitting broadcasts without paying the proper statutory fee. *See* 17 U.S.C. § 111(c)(2). The district court bifurcated the case; the first phase was to deal with the proper definition of gross receipts, the second, to follow if it was determined that Cablevision had not complied with the law, with the question of what copyrights had been infringed and what remedies were due.

The NCTA entered the battle in September of 1983 by filing a complaint for declaratory judgment regarding the meaning of the Act against the same defendants. It was the NCTA's position that cable systems should be allowed to attribute a portion of the revenues received as subscribers' fees for each tier containing both broadcast and cable-originated programming to the latter programming and to exclude that amount from gross receipts. In effect, the NCTA was challenging the decision of the 1978 regulations not to allow allocation and abandoning—indeed reversing—its position in the 1981 hearings before the Copyright Office. The district court ordered the NCTA to join the Copyright Office and the Register of Copyrights as necessary parties and then consolidated the cases and ruled on motions for summary judgment.

The district court declined to accord deference to the Copyright Office's regulation, holding that the regulation's definition of gross receipts did "not have a reasonable basis in law and frustrate[d] the underlying congressional policy." 641 F.Supp. at 1160. The district judge concluded that it "seem[ed] unfair" to require a cable system to pay the section 111 royalty fee on non-broadcast transmissions for which it had already paid merely because the channel was in the same tier with broadcast programming. *Id.* The court however rejected Cablevision's attempt to equate "ba-

sic service" with "first tier" as also inconsistent with Congress' purpose and as inviting manipulation. It instead agreed with the NCTA that the statute requires revenues attributable to nonbroadcast programming to be excluded from gross receipts and ordered the Copyright Office to devise a means of performing this allocation. *Id.* at 1162–63. Finally, the court dismissed the counterclaims, finding that Cablevision "did comply with the spirit of the law." *Id.* at 1163. On appeal, all parties but the NCTA attack the district court's definition of gross receipts, and the Copyright Owners seek reversal of the dismissal of their counterclaims.

## II.

We agree with government counsel's statement at oral argument that, as applied to the cable industry as now constituted, section 111 is "not a model of clarity." The statute fails to define the basic terms at issue here, and the legislative history strongly indicates that Congress never considered the arguments now before us. The instant case thus would seem to be controlled by *Chevron U.S.A. Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.CT. 2778, 81 L.Ed.2d 694 (1984), in which the Supreme Court addressed the "bubble concept" for defining "stationary source" within the Clean Air Act Amendments of 1977 and concluded that an examination of the legislation and its history revealed that Congress had no specific intention regarding the matter. *Id.* at 851, 862, 104 S.Ct. at 2786, 2791. The Court held that, in the face of such legislative silence, "the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843, 104 S.Ct. at 2782.[12] But before we examine the reasonableness

---

12. We are urged to undertake a more searching review on the strength of language in *INS v. Cardoza-Fonseca,* — U.S. —, 107 S.Ct. 1207, 94 L.Ed.2d 434 (1987). Cablevision in particular argues that this case means that a court owes no deference to an agency whenever "a pure question of statutory construction," *id.* at 1221, is involved. The Supreme Court has recently confirmed, however, that the language in *Cardo-* *za-Fonseca* does not alter the *Chevron* test— courts are to use the "traditional tools of statutory construction" to determine congressional intent, and to defer to the agency's permissible construction when the statute is "silent or ambiguous." *NLRB v. United Food & Commercial Workers Union, Local 23,* — U.S. —, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *see also id.,* at —, 108 S.Ct. at 426 (Scalia, J., concurring).

of the Copyright Office's interpretation, we must first deal with an anterior question: Does the promulgating agency, the Copyright Office, have authority to interpret the statute and are *its* interpretive regulations due judicial deference if reasonable?

Cablevision and the NCTA contend that the Copyright Office's interpretation is owed no deference because the Office has no authority to issue such a substantive regulation. The NCTA's position on this point, however, is paradoxical; it argues that "the Copyright Office lacks the legal authority and expertise to issue binding interpretations of the Copyright Act," yet at the same time asks us to direct that same Office to issue regulations (forms) to implement its general intra-tier allocation proposal. The awkwardness of the NCTA's position serves to emphasize that this statute is not self-executing. Given Congress' awareness of the rapid changes taking place in the cable industry, we cannot believe that Congress intended that there be no administrative overseer of this scheme. The statute's language is not to the contrary. Section 702 of title 17 of the United States Code authorizes the Register of Copyrights "to establish regulations ... for the administration of the functions and duties made the responsibility of the Register under this title." More specifically, section 111(d)(1) of that title directs that cable systems deposit their compulsory license royalty fees with the Register of Copyrights, "in accordance with requirements that the Register shall, after consultation with the Copyright Royalty Tribunal ..., prescribe by regulation."

Cablevision and the NCTA resist the obvious import of these passages by contending that this rulemaking power is limited to the ministerial task of designing forms, and they present authority asserted to stand for the proposition that the Copyright Office is unusual among government agencies in that its interpretations of the statutes it administers are due no judicial deference. Of course, designing forms to implement the NCTA's proposal has a substantial policy component. But, more to the point, we observe that this case is fundamentally one of first impression regarding section 111 and hold that the cases cited do not, for reasons we will discuss, establish the general principle that the Copyright Office's interpretation of that statute can be ignored. Our holding on deference due the Office does not extend beyond the bounds of its interpretation of section 111, but we do believe the Office's construction of at least that section is due deference.

We have emphasized that the compulsory licensing scheme was a break from the traditional copyright regime of individual contracts enforced in individual lawsuits. If we agreed that the Copyright Office had no power to interpret the statute, every dispute over the meaning of the statute could give rise to an infringement action [13] where, as this case suggests, enormous damage claims are commonplace.[14] If, on the other hand, reasonable interpretations of the statute by the Copyright Office are due judicial deference, a copyright holder's incentive to bring infringement actions that are based on interpretations other than those of the Copyright Office would be reduced. Since Congress consciously rejected traditional, contract-based implementation as unworkable, a holding that forced resolution of every dispute in an infringement or declaratory judgment action would be unfaithful to this policy choice and antithetical to Congress' central concern of providing a low cost transfer of copyrighted materials.

We are also unpersuaded by the suggestion that no deference is due the Office because it lacks expertise in this field. The Copyright Office certainly has greater expertise in such matters than do the federal courts; and while watching over the cable industry may have been a novel brief for the Copyright Office when the new Act was passed, that agency has had time to

---

**13.** No party argues that the CRT or the FCC, or anyone other than the Copyright Office or the judiciary, has authority to interpret the language in question.

**14.** Cablevision suggests it could be subject to a $3 billion judgment.

accumulate experience. But, in any event, *Chevron*'s rationale for deference is based on more than agency expertise.

> [A]n agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments.... [I]t is entirely appropriate for this political branch of the Government to make such policy choices —resolving the competing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

*Chevron*, 467 U.S. at 865–66, 104 S.Ct. at 2792–93. Like the Court in *Chevron*, we are faced with several interpretations of ambiguous language which really involve competing policies among which Congress did not explicitly choose. We see no reason to deny the Copyright Office's legitimacy in selecting, as the EPA did in *Chevron*, among those choices so long as the interpretation selected is reasonable.

The Supreme Court implicitly considered whether deference is due the Copyright Office's construction of the Copyright Act in *DeSylva v. Ballentine*, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956). Resolving a dispute between an author's widow and his illegitimate child, the Court took note of Copyright Office regulations, recently rescinded though apparently still followed in practice, that ostensibly governed the issue. The Court stated that it "would ordinarily give weight to the interpretation of an ambiguous statute by the agency charged with its administration," *id.* at 577–78, 76 S.Ct. at 978, but declined to rely on the interpretation because the fact that the practice was "more the result of a decision that there is substantial doubt over the question, rather than the result of a confident interpretation of the statute" deprived the practice "of any force as an interpretation of the statute," *id.* The Supreme Court has thus indicated that it

would defer to the Copyright Office when the latter actually interpreted the statute, undermining the notion that the Office is never owed deference.[15]

To be sure, the Copyright Office in this case may have come close to the point of excessive diffidence identified in *DeSylva*. In its statement promulgating the 1984 regulations, the Office "welcome[d] the guidance of the courts on 'tiering,'" but concluded it could not justify further delay in issuing regulations in light of requests from "the major interests affected by the compulsory license" that the agency take a position. 49 Fed.Reg. 13,029, 13,031 (1984). The Office also stated it could not "provide the flexibility requested by cable systems absent guidance from the Congress or the courts." *Id.* at 13,035. On balance, however, we conclude that the Office did see itself as having the authority to issue regulations and did make "a confident interpretation of the statute." *DeSylva*, 351 U.S. at 577, 76 S.Ct. at 978. The Office stated that "[w]ith respect to administration of the Copyright Act in general and the compulsory licenses in particular, the Copyright Office must and does, however, interpret the Act." 49 Fed.Reg. 13,029, 13,031 (1984). After weighing the potential administrative costs of intra-tier allocation, it concluded that "the Copyright *Act* does not permit any proration or other allocations of either DSE's or gross receipts," *id.* at 13,035 (emphasis added)—*not* that the Office did not have the power to order the allocation. The Office thus did interpret the statute with the meaning of *DeSylva*.

Cablevision and the NCTA also rely on *Bartok v. Boosey & Hawkes, Inc.*, 523 F.2d 941 (2d Cir.1975). The Second Circuit there refused to give weight to a definition of "posthumous" appearing on a Copyright Office form, stating flatly that "the Copyright Office has no authority to give opinions or define legal terms and its interpretation on an issue never before decided should not be given controlling weight."

---

**15.** The *DeSylva* Court may also have been unwilling to attribute to Congress an intent to delegate to the Copyright Office authority over a matter such as the descent of property that is traditionally entrusted to the states.

*Id.* at 946–47 (footnotes omitted).[16] But the court held the interpretation put forward by the Office was inconsistent with legislative intent, so its statement on the deference due the Office would seem to be a dictum. In any event, the Second Circuit was not considering section 111, and we cannot agree with Cablevision and the NCTA that the court's proposition, even if generally sound, should be extended to cover that section. We think Congress saw a need for continuing interpretation of section 111 and thereby gave the Copyright Office statutory authority to fill that role. Its interpretations are therefore due the same deference given those of any other agency. We thus turn to the reasonableness of the construction at issue.

## III.

■ The regulation applies the language of 17 U.S.C. § 111(d)(1)(B): "the gross receipts from subscribers ... for the basic service of providing secondary transmissions of primary broadcast transmitters." We find it telling that the interpretations of that language offered by Cablevision and the NCTA as alternatives to the Copyright Office's regulation violate the canon of construction that effect should be given to every word of the statute so that no part is rendered "inoperative or superfluous." *Norfolk & W. Ry. v. United States,* 768 F.2d 373, 379 (D.C.Cir.1985), *cert. denied,* — U.S. —, 107 S.Ct. 270, 93 L.Ed.2d 247 (1986). The NCTA's interpretation, adopted by the district court, would allow cable companies to assign monetary values to non-broadcast programming that is combined with broadcast programming in a mixed tier and to exclude those amounts from gross receipts. This approach reads "basic service" out of the statute; under this view, the language could as easily be "gross receipts from subscribers ... for secondary transmissions of primary broadcast transmitters." By emphasizing only the delivery of

discrete stations, this reading ignores the clear implication of the phrase "basic service" that cable services are typically provided in packages.

■ Cablevision, conversely, contends that "basic service" is a well defined term of art, meaning the first or lowest tier. But a necessary consequence of this interpretation is that all language that follows that term is superfluous. Indeed, since Cablevision contends basic service can contain anything the cable system chooses, and not necessarily just—or even any— broadcast retransmissions, *see infra* p. 613, the phrase "of providing secondary transmissions of primary broadcast transmitters," which would seem to serve the purpose in the statute of explaining "basic service," could actually *contradict* "basic service." The Copyright Office's regulation is thus the interpretation before us that best accounts for the statutory language.

■ The regulation also evinces a full understanding of the structure and purpose that underlie that language. In holding the regulation to be inconsistent with the will of Congress and adopting the interpretation espoused by the NCTA, the district court in our view misunderstood a fundamental mechanism of the statute. The court correctly observed that liability under the compulsory license was to be limited to the retransmission of distant non-network programming, 641 F.Supp. at 1161; *see* H.R. REP. No. 94–1476, *supra,* at 90, but failed to appreciate how the distant signal equivalents satisfy that intention. Because the DSE value—and hence the percentage of the fixed gross receipts base due as a fee—rises with each distant broadcast channel retransmitted, the cable system pays only for distant non-network[17] programming actually broadcast.

That Congress intended the DSEs to correlate the number of distant signals carried and fees paid can be further established by

---

16. The *Bartok* court cites *DeSylva.* As our discussion of the latter case indicates, we do not believe it stands for this proposition.

17. Recall that a DSE of 0.25 is assigned to the retransmission of a distant network affiliate's signal, to approximate the proportion of non-network programming carried by such a station.

examining the divergences of the content of the revenue base and the programs eligible for reimbursement from the CRT. Congress *never* contemplated a precise congruence of the royalties paid and the amount of distant non-network programming actually carried. Instead, Congress picked a *convenient* revenue base and used the DSEs to discount it in a reasonable manner. Attempting to fine tune the gross receipts base to include only revenues from items reimbursable by the CRT is a plausible approach *a priori*, but it ignores Congress' actual decision and would ultimately render the DSE mechanism superfluous. Congress' clear understanding that gross receipts were to include revenues from subscription fees paid in part for the retransmission of local broadcasts (that much is apparent from the statutory language alone) is, since such local broadcasts are programming not eligible to draw from the fund administered by the CRT, a strong indication of its approach.[18] If an allocation between broadcast and non-broadcast programming revenues in each tier were required by the statutory scheme, one would wonder why Congress did not call for a further allocation, to remove local broadcast revenues from gross receipts, and do away with the DSE system altogether. The answer, it seems to us, must be that DSE calculations were considered more practical and were therefore adopted in lieu of attempts at such allocation. All cable systems, moreover, pay a section 111 fee regardless of whether they carry any distant signals. *See supra* note 5. A pay-

ment scheme that reflected usage exactly would not impose such a requirement. Finally, it should be noted that the Act was an attempt to simulate the market in the face of the market's inability to provide precise fits between retransmissions and royalty fees, and so the Act could not itself aspire to too much precision.

In short, the reasonableness of the regulatory requirement that all revenues from a tier containing one retransmitted broadcast signal be included in gross receipts cannot be attacked for its failure to allow cable systems to attribute a value to nonbroadcast programs and to subtract that value from gross receipts.[19] We find no requirement in the statute or its history that the fee paid by a cable system reflect precisely the value it received from retransmissions —indeed, as we have shown, in many cases the relationship is skewed considerably. Congress instead chose an easily calculable revenue base and used the DSEs to approximate the value received by the cable companies. The Copyright Office has simply continued that practice.

Comparison of the Copyright Office's regulation with the position now espoused by the NCTA suggests a further reason deference is due the regulation. The NCTA's interpretation, endorsed by the district court, would create "a hornet's nest of problems."[20] If five channels are sold as a package for $5, and none is priced separately for individual sale, one can conclude nothing more about the revenue that each generates individually than that it does not exceed $5.[21] The artificiality of contending

---

**18.** The same is true of network programming on distant network affiliates. *Gross receipts* are not reduced to account for the payment copyright owners already receive for network programming, *DSEs* are. *See supra* text accompanying note 6.

**19.** The regulation's stance on attribution is also due deference because of its relative contemporaneity with the enactment of the statute and its consistency. *See Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). It has its roots in the 1978 regulation prohibiting attribution. *See* 43 Fed.Reg. 27,827, 27,828, 27,-832 (1978).

**20.** The phrase is that of Robert W. Ross, testifying on behalf of the NCTA in hearings held by the Copyright Office on July 28, 1981, regarding

attempting to allocate revenues to particular items sold in a single tier for one price. Joint Appendix at 326; *see supra* p. 13. It is interesting that the regulation promulgated after the district court adopted the NCTA's approach simply directs cable systems to attribute any amount they see fit to cable-originated programming. It asks only that they maintain records of the amounts thus deducted from gross receipts. *See* 51 Fed.Reg. 30,214 (1986); *id.* 45,-110. No obvious method of attribution suggests itself.

**21.** We assume, perhaps unrealistically, that no television station would have a negative value for a large number of consumers.

that each is worth $1 is obvious from the example of a tier containing ESPN and four weather channels. Nor do viewer measurement techniques such as the Nielsen ratings provide a solution. Methodological wrangles and monitoring expenses far in excess of those required under the Copyright Office's regulation are easily foreseeable and would thwart the congressional goal of minimizing transaction costs.

■ The Copyright Office's interpretation avoids these obvious pitfalls, and that practicality alone provides substantial support for the reasonableness of its interpretation. When Congress delegates a function to an agency, we believe that an important element of congressional purpose is that the function be carried out sensibly and efficiently. Congress recognizes that it can only legislate, not administer, so it necessarily relies on agency action to make "common sense" responses to problems that arise during implementation, so long as those responses are not inconsistent with congressional intent. In *Drummond Coal Co. v. Hodel*, 796 F.2d 503, 507 (D.C. Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987), for instance, this court agreed that the Secretary of the Interior's definition of "coal produced" was reasonable, noting that the Secretary adopted the regulation out of concern for the vexing complications and expense that accompanied competing approaches and for the need for a uniform national standard. Similarly, including all revenues from any separately priced tier that contains one or more broadcast stations is a convenient, indeed perhaps the only reasonable, way of computing gross receipts that ensures a revenue base large enough to perform the function Congress intended—reimbursing copyright owners.

The reasonableness of the regulation is further bolstered by the ability it provides cable systems to control their own destiny. *See* 49 Fed.Reg. 13,029, 13,035 (1984) (Copyright Office's discussion of final regulation); *see also Drummond*, 796 F.2d at 507 n. 9 (coal companies can act to limit impact of interpretation). A company can segregate all its secondary transmissions into a single tier and thus avoid including in gross receipts any revenues from cable-originated programming. Although the Copyright Office has no authority to regulate the marketing practices of cable companies, the companies could on their own forgo those marketing advantages that now lead them to pay higher than necessary fees.

In its separate challenge to the reasonableness of the regulation, Cablevision puts forth an alternative that at least can be said not to present administrative complexity. Cablevision concedes that the gross receipts base was not necessarily intended to include only broadcast signals, and rather was selected to provide a clear, uniform, and constant base for the calculation of royalty fees, but asserts that the regulation is unfaithful to the Copyright Act by failing to equate "basic service" with the first tier of service to which all customers must subscribe. Cablevision argues that basic service was at the time of passage of the Act a trade term with the meaning Cablevision suggests and that the language was consistently used in earlier bills in the same manner.

Because Congress never considered the issue of "mixed tiering" this view is not without surface plausibility. The legislative history shows that Congress contemplated only one "tier" containing a mixture of broadcast and cable-originated stations. All higher "tiers" in this model contained only cable-originated stations for a separate fee, and these pay cable services were excluded from gross receipts. *See* H.R. REP. No. 94–1476, *supra*, at 96. Thus the tier from which gross receipts were to be calculated was at the same time all tiers (the only one) containing a broadcast signal —the Copyright Office's view—and the first tier alone—Cablevision's position.

As support for its construction, Cablevision points first to numerous affidavits of cable industry executives stating that basic service was an accepted trade term in the early 1970's, that it referred to the lowest tier of service, and that it was used interchangeably with "minimum level of service," "initial package," and "regular sub-

scriber service." Cablevision contends the Congress must be presumed to have adopted this trade meaning. Our difficulty with this argument is that one can concede each step and not reach Cablevision's conclusion. Congress may have envisioned basic service as the first tier or the initial package when debating the Act, but it also viewed this level of service as the *only* level—other than tiers of pay cable that were to be excluded from gross receipts. The truth, it seems to us, is that Congress *never considered* the situation of multiple tiers containing broadcasting materials, and use of an industry definition from a period when the practice under consideration was not widespread in the industry is singularly unenlightening.[22]

Cablevision nevertheless attempts to link its definition of basic service to the early concept of "adequate television service" that appeared in an unenacted Senate bill. *See* S. 644, 92d Cong., 1st Sess. (1971). That bill would have provided cable systems a compulsory license to retransmit local signals and any distant signals that would be a necessary complement to local broadcasting in providing "adequate television service"—service that would provide the system's customers access to a prescribed minimum range of stations—as defined by the Act. *See id.* § 111(c)(3). In return, cable systems were to pay a fee based on a percentage of gross receipts after reporting the "gross amounts paid to the cable system by subscribers for the basic service of providing secondary transmissions of primary broadcast transmitters." *Id.* § 111(d)(2). Cablevision argues that, since the language at issue in this case appeared initially in a bill relating to minimum or adequate service, basic service must be equivalent to "adequate" or "first tier" service.

Identity of language in an unenacted bill addressing adequate television service with language in an Act passed years later to deal with a transaction cost problem in the

copyright law is not, by itself, particularly significant. Putting to one side the weight properly to be accorded an unenacted bill, we observe that words can take on vastly different meanings in different contexts. *See, e.g., Director v. Black Diamond Coal Mining Co.,* 598 F.2d 945, 951 (5th Cir. 1979) (most words have multiple meanings, depending on context; absent evidence Congress intended to create a term of art, a word's meaning in one statute does not necessarily indicate its meaning in another). It is furthermore unclear whether the language of S. 644 does what Cablevision would have it do. The provision actually directing payment of a fee refers not to the "gross amounts paid ... for the basic service" that the company is required to report, but to "the gross receipts from subscribers," presumably a much broader concept, even in Cablevision's view. *Id.* at § 111(d)(2)(B).

The most troublesome aspect of this argument, however, is the explicit equation of basic service with adequate service. Cablevision has argued to us that the first tier—basic service in its parlance—may contain anything the cable system chooses. Its concept of basic service is therefore simply unrelated to adequate service, which presumably involves a specific content. And we are bemused by Cablevision's slightly misleading attempts to suggest that the FCC's "must-carry" rules, which require a cable system to provide certain services, assure a minimum content on the first tier. This court has twice struck down particular FCC must-carry rules as incompatible with the First Amendment. *Quincy Cable TV v. FCC,* 768 F.2d 1434 (D.C.Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 977 (1986); *Century Communications Corp. v. FCC,* 835 F.2d 292 (D.C.Cir. 1987).

Even where two equally tenable interpretations of a statute are put forward, one by the agency charged with administering the

---

**22.** A homely metaphor illustrates the tension between Cablevision's view and Congress' intent. Imagine a fee to be paid on the gross revenue from the sale of dressers, enacted at a time when dressers were available only as single pieces of furniture. With the advent of modular furniture, is it more in keeping with the statute's spirit to base the fee on revenues from the sale of bottom drawers only, which every customer must buy, or on the sale of all dresser drawers?

Act—as we have held the Copyright Office to be—and the other by a private party, we will favor the former. *See Udall v. Tallman*, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965). But on examination we find Cablevision's position untenable, since it could lead to the absurdity of only a minuscle portion of revenues, at the option of a cable company, being included in gross receipts—hardly a reasonable interpretation of Congress' objective.[23]

For the foregoing reasons, we conclude that the Copyright Office's regulation is reasonable as applied to calculations involving any tier viewed in isolation, the primary element of dispute in this case. If we rested on this conclusion, however, we would omit discussion of a matter heavily debated in the briefs and at oral argument and relied on substantially by the district court. In the proceeding below, the district court allowed counsel for the NCTA to request from Dorothy Schrader, General Counsel of the Copyright Office, responses to certain hypothetical questions regarding the Office's interpretation of its regulation. Whether or not that procedure was appropriate, once it was employed—once the General Counsel's letter of reply had put this ancillary dispute in issue—we understand why the district court acted on the questions the letter raised.

■ Nevertheless, and despite the government's failure to argue the point explicitly, we believe that the issues raised in Schrader's June, 1986 letter are unripe for judicial review. But because the issue has been hotly litigated both before us and below, and, more importantly, because our conclusion regarding unripeness stems as much from the confusion created by the letter as from any intrinsic unsuitability of the issues for disposition, we find it necessary in explaining our conclusion to discuss in some detail the 1986 letter and the debate surrounding it.

The letter deals with marketing practices we will style "discounts" and "tie-ins." The following hypotheticals are addressed:

A cable system offers tier A, containing all broadcast signals, for $10, tier B, containing two non-broadcast and two broadcast signals, for $4; and tier C, containing a pay cable station, for $9. General Counsel Schrader considers both a discount, offering all three tiers for $22, and a tie-in, under which the subscriber could receive tier A for $10 only after subscribing to tier C for $9. Schrader's opinion specifically requires the entire $22 discount price to be included in gross receipts, just as the $19 under the tie-in must be. She explained:

> Whenever the two types of service are offered for a single price or, if on separate tiers, whenever it is necessary to subscribe to one tier in order to receive another, the two services are in reality being offered as a single package of service; if secondary transmissions are included in the package, gross receipts from both tiers or the combined package must be reported and used in calculating copyright royalties.

Joint Appendix at 491 (emphasis omitted).

The NCTA argues, and the district court agreed, *see* 641 F.Supp. at 1160, that this language, if followed literally, would violate Congress' intent. They both read the letter to suggest that in precisely the paradigm case envisioned by Congress—in which the subscriber must purchase a basic package of retransmitted stations before going on to buy pay cable—receipts from pay cable must, contrary to Congress' specific intent, be included in gross receipts because "it is necessary to subscribe to one tier in order to receive" pay cable. We have some reason to believe, however, that the General Counsel was addressing a slightly different problem and merely expressed herself incompletely. Another, earlier letter from the General Counsel that appears in the record, Joint Appendix at 488, was written in August of 1985 and avoids the problem the 1986 letter seemingly creates.

The 1985 letter and the parties' presentations suggest the following analysis. Whenever a tier, call it Y, can be purchased

---

**23.** We intimate no view as to whether the operation of the must-carry rules at an earlier time served to make Cablevision's behavior more or less willful. That issue is for the district court on remand. *See infra* Section IV.

only after another tier, X, has been purchased, there is a danger that the price associated with Y is merely notional. Thus, if Y contained broadcast signals that would be valued by consumers at $20, a cable operator bent on downward manipulation of receipts from the sale of Y could construct an X tier of automated services worth $1, make Y available only to subscribers to X, charge $19 for X and $2 for Y and, absent a requirement that the two amounts be lumped together, understate gross receipts for Y by $18 per subscriber. This technique will not work in reverse, however. Subscribers forced to buy through tier Y to be allowed to pay $19 for tier X will simply stop after buying Y, leaving the cable operator to absorb a loss or to raise the price to reflect value accurately. Generally, if a subscriber can buy a given tier without purchasing any others, its nominal price will be at least as great as its value; if the subscriber must purchase another tier to receive the one in question, the latter's price may be understated.

The language of the General Counsel's 1986 letter therefore would appear, as the district court discerned, to be too sweeping. Indeed, counsel for the Copyright Owners, a group whose interests would certainly be served by a strict adherence to the literal language of Schrader's letter, conceded it was "overbroad." The letter suggests that the two cases just described should be treated the same—revenues from both tiers should go into gross receipts regardless of whether X or Y must be purchased first—when there is a strong argument only the first should be so treated. The letter does analyze the tie-in case as we tentatively do, for in that hypothetical the broadcast signals in A can be bought only after purchasing C, so the price for A may be no more than nominal and there is a risk that gross receipts will be understated. The treatment of the discount seems incorrect, though, for as we understand the hypothetical it would be possible to buy all the broadcast signals, A and B, alone for $14. That $14 price is therefore an accurate reflection of the value placed on the package and could be used in calculating gross receipts from retransmission from the $22 discount fee.

The Government's Reply Brief, moreover, adopts the analysis of the 1985 letter and seems to back delicately away from the inconsistencies in the 1986 letter. But at oral argument, counsel for the Government was unwilling to make any firm statement regarding the Copyright Office's position on this issue. We cannot, in light of this rather bewildering array of conflicting positions, affirm the reasonableness of this facet of the agency's interpretation of the statute. We nevertheless are quite unprepared to reject either the regulation or the interpretation in Schrader's 1986 letter on this basis. First, there is no showing as to the Copyright Office's actual practice in these cases. Requirements that subscribers "buy through" initial tiers of broadcast programming before receiving pay cable stations such as HBO are apparently widespread; it would be imprudent to invalidate an interpretation of a regulation on the subject, without more information, on the strength of one letter from the General Counsel replying to a hypothetical question.

Further, the rulemaking from which this regulation sprang never addressed tie-ins or discounting; it focused on the treatment of individual tiers. 49 Fed.Reg. 13,029 (1984). And the lawsuits now before us are focused on the first tier/basic service equivalence and the permissibility of allocating values within a tier. The tie-in and discount issues are a litigating afterthought, and we are uncertain from the record as to the Copyright Office's authoritative interpretation. It is often necessary to review agency action in a rather theoretical setting, but a court must have some sort of record upon which to base its review. There has been here no showing of an interpretation to which the Office firmly adheres. The Supreme Court in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), observed that the purpose of the ripeness doctrine in the context of reviewing administrative action is to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has

been formalized and its effects felt in a concrete way by the challenging parties." *Id.* at 148–49, 87 S.Ct. at 1515. If this dispute is not abstract, it is certainly not yet well defined enough for judicial review. The Copyright Office, will, we hope, clarify its position regarding tie-ins, perhaps in a rulemaking. Any party injured by the Office's new application of the regulation could, of course, seek relief from that concrete injury. *See Geller v. FCC,* 610 F.2d 973, 978 (D.C.Cir.1979).

## IV.

The district court ordered that the first phase of the trial consider "[w]hether plaintiff complied with the statutory prerequisite conditions for obtaining a compulsory license," and that a further hearing would be had, if it were determined that Cablevision was not entitled to a compulsory license, regarding "which copyrights of defendants have been infringed and the remedies therefor." In its opinion ending the first phase, the court dismissed the Copyright Owners' counterclaims. It noted that Cablevision had paid the fees indicated by its method of calculating gross receipts and had posted bonds to cover the difference between its payments and the amount required by the Copyright Office's regulation.[24] The court concluded Cablevision had complied "with the spirit of the law." 641 F.Supp. at 1163. The Copyright Owners point to the bifurcation order and claim this disposition was premature.

Section 111(c)(2) makes a cable system liable for infringement when, without paying the required royalty fee, it engages in the "willful or repeated secondary transmission" of primary transmissions. We recognize that the district court might have intended to conclude as a matter of law at the end of the first phase that Cablevision's conduct was neither willful nor repeated within the meaning of the Act.[25] The court did not couch its ruling in the statutory language, however, and while it might have

thought "willful or repeated" equivalent to a disregard for the "spirit of the law," it did not clearly explain its reasoning. Nor did the court address how, if at all, Cablevision's conduct is to be judged in light of regulatory changes. Because we are unsure of the basis for the district court's dismissal and are unwilling to consider the issue of liability for infringement without the benefit of its full reasoning, and because it is also unclear whether the court's opinion directed Cablevision to pay back royalties for the entire period not excepted by the statute of limitations or only for the period after promulgation of the regulation—the period covered by the bonds the district court mentioned—we reverse the dismissal and remand for further proceedings on the counterclaim consistent with this opinion. The action is

*Reversed in part and reversed and remanded in part.*

---

**24.** Cablevision had used its accounting convention since 1979 but posted bonds only for the periods after the 1984 issue of the regulation.

**25.** "The words 'willful or repeated' are used to prevent a cable system from being subjected to severe penalties for innocent or casual acts. . . .

The Committee does not intend . . . that a good faith error by the cable system in computing the amount due would subject it to full liability as an infringer." H.R.REP. No. 94–1476, *supra,* at 93, 1976 U.S.CODE CONG. & ADMIN.NEWS 5708.