**BONNEVILLE INTERNATIONAL CORPORATION, et al.,**
Plaintiffs,

v.

**Marybeth PETERS, as Register of Copyrights, et al., Defendants.**

No. CIV.A. 01–0408.

United States District Court,
E.D. Pennsylvania.

Aug. 1, 2001.

R. Bruce Rich, Weil, Gotschall & Manges, Marquerit S. Walsh, Littler, Mendelson, P.C., Philadelphia, PA, Caroline R. Clark, Mark A. Jacoby, Weil,Gotshal & Manges, LLP, New York City, for Plaintiffs.

Theodore C. Hirt, U.S. Dept. of Justice, Civil Div., Washington, DC, Richard G. Phillips, U.S. Dept. of Justice, Washington, DC, for Marybeth Peters.

Vincent V. Carissimi, Pepper & Himlton, LLP, Philadelphia, PA, Robert Alan Garrett, Leonard H Becker, Rebecca Nassab, Arnold & Porter, Washington, DC, for Recording Industry Assoc.

### *MEMORANDUM*

SCHILLER, District Judge.

This case involves a request by the Plaintiffs that the court review and overturn a Rulemaking by the United States Copyright Office. The Rulemaking considered whether or not an FCC-licensed AM or FM radio broadcaster, who is now exempt from paying royalties to record producers and recording artists when it broadcasts a recording in its FCC-licensed geographic area, remains exempt when the same broadcast is transmitted digitally over the Internet, in a practice known as "streaming."[1]

---

1. Streaming involves the digital transmission of programming over the Internet. As used herein, "AM/FM streamer" refers to an FCC-licensed AM or FM broadcaster that transmits

Plaintiffs, owners and operators of hundreds of AM and FM radio stations across the country, have brought this action seeking judicial review of an administrative "final rule" issued on December 11, 2000 by the Copyright Office. *See Public Performance of Sound Recordings,* 65 Fed. Reg. 77292 (Dec. 11, 2000) (the "Rulemaking"). The Copyright Office is joined by the Intervenor–Defendant Recording Industry Association of America ("RIAA"). At issue are the rights possessed by owners of works of creative expression which are enumerated in section 106 of the Copyright Act, *see* 17 U.S.C. § 106 (Supp.1998), and the limitations on these rights which are set forth in sections 114 and 112 of the Act.[2] Section 114(d)(1)(A) of the Copyright Act exempts "nonsubscription broadcasts" from the section 106 public performance right. *See* 17 U.S.C. § 114(d)(1)(A). Similarly, section 112 sets out exemptions from the public performance right for making ephemeral copies of recordings for the limited purpose of effecting a transmission. *See* 17 U.S.C. § 112. Plaintiffs urge that their practice of streaming AM/FM broadcasts over the Internet should be classified as a "nonsubscription broadcast" and that they should be entitled to make ephemeral copies of copyrighted recordings under section 112 of the Copyright Act.

In its Rulemaking, the Copyright Office determined that AM/FM broadcast signals transmitted simultaneously over a digital communications network, such as the Internet, are not exempted by section 114(d)(1)(A), and thus are subject to the limited public performance right in sound recordings. *See id.* Plaintiffs claim that the Copyright Office's Rulemaking exceeded the agency's statutory authority. Plaintiffs seek a declaratory judgment stating that section 114(d)(1)(A) of the Copyright Act exempts Federal Communications Commission ["FCC"]-licensed broadcasters who engage in nonsubscription, simultaneous transmissions of their over-the-air programming from the digital performance right of section 106(6) of the Act, and that such AM/FM broadcasters are eligible for the single ephemeral copy exemption under section 112(a) of the Act. Defendants have similarly filed motions for summary judgment seeking an order from this court which sustains the rule promulgated by the Copyright Office. For the reasons set forth below, I grant Defendants' motion and deny Plaintiffs' motions.

## I. Jurisdiction and Venue

This court properly exercises jurisdiction over this matter pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 702–04, which authorizes judicial review by this court of final agency actions, and 28 U.S.C. § 1338(a), which gives district courts original jurisdiction over civil actions arising under United States copyright law. This court is empowered to issue declaratory relief, as requested by plaintiffs here, by 28 U.S.C. § 2201(a). Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(e).

## II. The Standard of Review for Summary Judgment Motions

Before me are cross motions for summary judgment, all parties having agreed

---

its broadcast over the Internet in digital format. "AM/FM streaming" refers to the practice of transmitting broadcasts over the Internet in digital format by FCC-licensed AM or FM broadcasters.

**2.** More specifically, Plaintiffs are seeking exemption from the public performance right of

section 106. *See* 17 U.S.C. § 106. The public performance right allows copyright owners either to prevent others from publicly performing their work (publicly performing includes transmissions of copyrighted works) or to charge a royalty for any such transmissions. *See* 17 U.S.C. § 106.

that this action presents solely issues of statutory construction and involves no issues of fact. Summary judgment shall be granted where, after consideration of the evidence in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed. R.Civ.P. 56(c)).

## III. Background

### A. The Creation of a Sound Recording Performance Right

United States copyright law has long recognized an exclusive right of public performance in a musical composition. *See* 17 U.S.C. § 106(4). However, copyright protection for sound recordings embodying musical compositions, the copyright protection at issue in the case at bar, is a far newer concept. The recording industry first requested a broad performance right in the 1920s and has continued to request such a right ever since. *See Subcomm. on Courts, Civil Liberties, and the Admin. Of Justice, House Comm. On the Judiciary, Performance Rights in Sound Recordings,* at 28–58 (Comm. Print 1978). While the Copyright Office has supported a broad sound recording performance right, Congress, until recently, had resisted giving copyright protection to sound recordings of musical compositions.

Congress first extended limited federal copyright protection to sound recordings with the Sound Recording Amendment of 1971, Pub.L. No. 92–140, 85 Stat. 391 (1971). The Sound Recording Amendment of 1971 was enacted to counter the increasingly common unauthorized commercial copying and sale of sound recordings made

possible by advances in duplicating technology. *See* H.R.Rep. No. 92–847, at 2–3, 5 (1971); S.Rep. No. 92–72, at 3–4 (1971). The 1971 amendment created a provisional limited copyright in reproductions of sound recordings and the distribution of such reproductions. The new limited copyright did not include a public performance right, as it was clearly limited to the direct reproduction of the sounds of the original recording. The provisional sound recording reproduction right became permanent with the enactment of the 1976 Copyright Act. *See* Pub.L. No. 93–573, 88 Stat. 1873 (1974) (17 U.S.C. § 102.)

#### 1. The Digital Performance Right in Sound Recordings Act of 1995

Until 1995, the sound recording copyright did not include any right in public performances of sound recordings. While the public performance of a sound recording would most likely require a license from the owner of the musical composition, no permission was required from the holder of the copyright in the sound recording itself.[3]

The Digital Performance Right in Sound Recordings Act ("DPRA") expanded the scope of copyright protection afforded to sound recordings by including a new right for public performances of sound recordings by digital audio transmission. *See* 17 U.S.C. § 106(6). Section 106(6) grants "the exclusive right to do and to authorize:

(6) in the case of sound recordings, to perform the copyrighted work publicly by means of a digital audio transmission."

*Id.* The new public performance right applied only to subscription and interactive services and specifically exempted broadcasting and related transmissions. *See* S.Rep. No. 104–128, at 17 (1995) ("1995

---

**3.** A "public performance" of a recording in-   cludes the transmission of a recording.

Senate Report"). Congress expressly refused to create a more general performance right:

   ... the Committee has sought to address the concerns of record producers and performers regarding the effects that new digital technology and distribution systems might have on their core business without upsetting the longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades. Accordingly, the Committee has chosen to create a carefully crafted and narrow performance right, applicable only to certain digital transmissions of sound recordings.

*Id.* at 13.

The motivating force behind Congress' creation of the limited public performance right was the desire to protect record companies and recording artists from a reduction of record sales threatened by technological developments, specifically interactive and subscription services made possible by the emergence of digital audio services capable of delivering high-quality transmissions of sound recordings. Such transmissions would enable subscribers in their homes to obtain direct, time-certain transmissions of specific sound recordings. *See id.* at 14–15; H.R.Rep. No. 104–274 at 5–9, 12–13 (1995) ("1995 House Report"). Interactive and subscription services are capable of providing a consumer with the ability to hear specific recordings on demand, thereby providing a potential substitute for record ownership. *See* 1995 Senate Report at 14–15. The Senate Report also notes that the underlying ratio-

nale for the creation of the limited right was the impact on record sales posed by subscription and interactive services "but not by broadcasting and related transmissions." *Id.* at 14–15.

In order to protect against the displacement of record sales while simultaneously protecting the "longstanding business and contractual relationships among record producers and performers, music composers and publishers and broadcasters that have served all of these industries well for decades," 1995 Senate Report at 15, the DPRA included a three-tiered system for categorizing digital transmissions based on their likelihood to affect record sales.

Those transmissions which posed the greatest risk to record sales, such as those engaged in by interactive services,[4] became subject to discretionary licenses from individual rights holders. Entities wishing to transmit a recording through an interactive service were required to obtain a license from the individual rights holders on mutually agreed terms. The individual rights holder was authorized to refuse to license the transmission. *See* 17 U.S.C. § 114(f) (Supp.1995). Under the DPRA, those subscription services which make digital audio transmissions were entitled to the statutory license. *See* 17 U.S.C. § 114(d)(2) (Supp.1995).

In a second category were transmissions which posed a lesser risk to record sales. Transmissions in this category, such as non-interactive, subscription digital transmissions, were subject to a statutory license. *See* 17 U.S.C. § 114(d)(2) (Supp. 1995). Under the statutory license, copyright owners were compelled to grant per-

---

4. Interactive services are often referred to as "audio-on-demand" services, "celestial jukeboxes," or "pay-per-listen" services. Such services enable the listener to obtain a time-certain transmission of a specific sound recording chosen by the listener. *See* 1995 House Report at 5–9.

mission for a qualified transmission.[5] In those cases in which copyright owners and transmitters were unable to agree upon a license rate, an interested party was permitted to apply to the Library of Congress for a determination of a reasonable rate for the intended performance. In such a situation, the Copyright Office was empowered to convene a Copyright Arbitration Royalty Panel ("CARP") to arbitrate proper rates and terms. *See* 17 U.S.C. § 114(f) (Supp.1995).

Section 114's final category exempted certain transmissions from the sound recording performance right. *See* 17 U.S.C. § 114(d)(1)(A) (Supp.1995). These transmissions were exempted because they were viewed as posing little threat to sound recording sales. *See* 1995 House Report at 14. Within this final category, Congress specifically exempted "nonsubscription broadcast transmissions." Section 114(d)(1)(A) of the Copyright Act as amended by the DPRA provided:

> (d) LIMITATIONS ON EXCLUSIVE RIGHT.— Notwithstanding the provisions of section 106(6)—
>
> > (1) EXEMPT TRANSMISSIONS AND RE-TRANSMISSIONS.—The performance of a sound recording publicly by means of a digital audio transmission, other than as part of an interactive service, is not an infringement of section 106(6) If the performance is part of—
> >
> > (A) * * *
> >
> > (iii) a nonsubscription broadcast transmission[.]

17 U.S.C. § 114(d)(1)(A) (Supp.1995). Section 114(d)(1) also exempted "nonsubscription transmission[s] other than [ ] retrans-

mission[s]." 17 U.S.C. § 114(d)(1)(A)(i) (Supp.1995), as well as "initial nonsubscription transmission[s] made for direct reception by members of the public of a prior or simultaneous incidental transmission that is not made for direct reception by members of the public." 17 U.S.C. § 114(d)(1)(A)(ii) (Supp.1995).

Under Section 114(j) of the Copyright Act as amended by the DPRA, a "nonsubscription transmission" was defined as "any transmission that is not a subscription transmission." 17 U.S.C. § 114(j)(5) (Supp.1995). A "subscription" transmission was defined as "a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission." 17 U.S.C. § 114(j) (Supp.1995). A "broadcast" transmission was defined as "a transmission made by a terrestrial broadcast station licensed as such by the [FCC]." 17 U.S.C. § 114(j)(2) (Supp.1995).

## 2. The Digital Millennium Copyright Act of 1998

In 1998, Congress once again amended the Copyright Act with the Digital Millennium Copyright Act of 1998 ("DMCA"). Congress eliminated the two exemptions that had been included in section 114(d)(1)(A) under the DPRA for "a nonsubscription transmission other than a retransmission" and for "an initial nonsubscription retransmission made for direct reception by members of the public of a prior or simultaneous incidental transmis-

---

**5.** In order to qualify for the statutory license, the transmitters were subject to technical requirements, including requirements that they: (1) not be "interactive;" (2) not use a signal that causes the receiver to change from one program channel to another; (3) not pre-

announce the broadcast of particular songs; (4) not violate the "sound recording performance complement" and, (4) must, if feasible include various information about the recording being transmitted. *See* 17 U.S.C. § 114(d)(2).

sion that is not made for direct reception by members of the public." 17 U.S.C. § 114(d)(1)(A) (Supp.1998). Congress simultaneously expanded the class of transmissions that would qualify for a statutory license, including some of the previously exempt nonsubscription, non-interactive transmissions. *See* H.R.Conf.Rep. No. 105–796, at 80 (1998). Notably, Congress did not alter the section 114(d)(1)(A) exemption for "nonsubscription broadcast transmission[s]" which is at issue here. 17 U.S.C. § 114(d)(1)(A).[6] The Committee report states:

> Section 114(d)(1)(A) is amended to delete two exemptions that were either the cause of confusion as to the application of the DPRA to certain nonsubscription services (especially webcasters) or which overlapped with other exemptions (such as the exemption in subsection (A)(iii) for nonsubscription broadcast transmissions). The deletion of these two exemptions is not intended to affect the exemption for nonsubscription broadcast transmissions.

H.R.Conf.Rep. No. 105–796, at 80 (1998).

The DMCA amendments affecting section 114(d)(1)(A) of the Copyright Act were created in response to "a remarkable proliferation of music services offering digital transmission of sound recordings to the public." *Staff of House Comm. on the Judiciary, 105th Cong., Section-by-Section Analysis of H.R. 2281 as passed by the United States House of Representatives on August 4, 1998*, at 50 (Comm. Print 1998). The House Manager noted that "services commonly known as 'webcasters' have begun offering the public multiple highly-themed genre channels of sound recordings on a nonsubscription basis." *Id.*

## B. The Ephemeral Recording Exemption of Section 112

Section 112 of the Copyright Act, permits the production of ephemeral copies of sound recordings under certain circumstances. *See* 17 U.S.C. § 112. Ephemeral recordings are reproductions of a work produced solely for the purpose of a transmission of the work by an entity legally entitled to publicly perform the work. *See* 1995 Senate Report at 83. An ephemeral recording, as its name implies, is retained only for a limited time.

Section 112(a)(1) allows FCC-licensed broadcast radio or television stations to make one ephemeral copy of a copyrighted work in furtherance of transmissions within its local service area. *See* 17 U.S.C. § 112(a)(1).[7] Section 112(e)[8] provides for

---

**6.** This exemption, as noted above, existed under the 1995 version of the Copyright Act in 17 U.S.C. § 114(d)(1)(A)(iii) (Supp.1995).

**7.** Section 112(a)(1)(B) reads as follows:

> (a)(1) Notwithstanding the provisions of section 106, and except in the case of a motion picture or other audiovisual work, it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license, including a statutory license under section 114(f), or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a) or for a transmitting organization that is a

broadcast radio or television station licensed as such by the Federal Communications commission and that makes a broadcast transmission of a performance of a sound recording in a digital format on a subscription basis, to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display, if . . .
> (B) the copy or phonorecord is used solely for the transmitting organization's own transmissions within its local service area, . . . .
> 17 U.S.C. § 112(a)(1)(B).

**8.** Section 112(e) states:

> (e) *Statutory License.* (1) A transmitting organization entitled to transmit to the public

a statutory license to make one or more ephemeral copies which applies to an entity publicly performing a sound recording under the section 114(f) statutory license or covered by the business establishment exemption. Without these rights to make ephemeral copies, the entity would be subject to the copyright owner's right of reproduction under section 106 of the Act. *See* 17 U.S.C. § 106.

## IV. The Copyright Office's Rulemaking

On March 1, 2000, RIAA petitioned the Copyright Office for a Rulemaking to clarify whether AM/FM broadcasters who simultaneously stream their broadcasts over the Internet could claim the section 114(d)(1)(A) exemption to the public performance right of section 106. *See* Petition for Rulemaking filed by the Recording Industry Association of America (March 1, 2000). AM/FM broadcasters who were already streaming had been negotiating with copyright owners to set rates and terms for streaming their broadcasts. The AM/FM streamers claimed that they were exempt from the digital performance right. *See id.* at 4.

In response to RIAA's request for a Rulemaking, the Copyright Office published a Notice of Proposed Rulemaking on March 16, 2000, requesting comments on both the need for a Rulemaking, and assuming a Rulemaking was necessary, the applicability of the section 114(d)(1)(A) exemption to AM/FM broadcaster streaming. *See* 65 Fed.Reg. 14227 (March 16, 2000).[9] The Copyright Office received numerous initial comments and reply comments in response to the notice.[10]

On December 11, 2000, the Copyright Office promulgated a rule stating that AM/FM broadcasters who stream their broadcasts over the Internet, or "AM/FM webcasters" as the Copyright Office refers

---

a performance of a sound recording under the limitation on exclusive rights specified by section 114(d)(1)(C)(iv) or under a statutory license in accordance with section 114(f) is entitled to a statutory license, under the conditions specified by this subsection, to make no more than 1 phonorecord of the sound recording (unless the terms and conditions of the statutory license allow for more), if the following conditions are satisfied . . .

17 U.S.C. § 112(e).

**9.** In response to RIAA's request for a Rulemaking, the National Association of Broadcasters ("NAB") filed suit against RIAA in the Southern District of New York on March 27, 2000, seeking a declaratory judgment that AM/FM broadcasters engaging in streaming were covered by the 114(d)(1)(A) exemption from the public performance right of section 106. *See NAB v. RIAA,* 00–CV–2330 (S.D.N.Y.). NAB then requested that the Copyright Office suspend its rulemaking pending the resolution of the suit filed in the Southern District of New York. The Copyright Office filed a second public notice requesting comments on whether to grant NAB's motion to suspend. *See* 65 Fed.Reg. 17840 (April 5, 2000). The Copyright Office decided not to suspend its Rulemaking. On April 17, 2000, RIAA moved to dismiss *NAB v. RIAA,* and on January 25, 2001, Judge Miriam Goldman Cederbaum granted RIAA's motion. *See NAB v. RIAA,* 00–CV–2330 (S.D.N.Y. filed Mar. 27, 2000) (Notice of Dismissal).

**10.** The Copyright Office received comments from BroadcastAmerica.com (providing a website for FCC-licensed AM/FM stations to webcast their signals), The American Society of Composers, Authors and Publishers, Broadcast Music, Inc., and SESAC, Inc. (all music performing rights organizations), the Digital Media Association ("DiMA") (representing companies that transmit and sell audio and audiovisual works to consumers via the Internet), AMFM, Inc., Bonneville International Corp., Clear Channel Comm., Inc., Cox Radio, Inc. Emmis Comm. Corp. and NAB (all broadcasters), RIAA, and other associations of broadcasters and webcasters. *See* Def. Copyright Office's Mem. in Supp. of Mot. to Dismiss, or, in the Alternative, for Summ. J. ("Copyright Office Mem."), at 12–14.

to them, are not exempt from the digital performance right of section 106. *See* Rulemaking at 77292. According to the Copyright Office, the exemption for "broadcast transmission[s]" under section 114(d)(1)(A) is limited to over-the-air transmissions by FCC-licensed broadcasters. *See id.* at 77301. In keeping with its determination, the agency amended the definition of "Service" to clarify that "any entity that transmits an AM/FM radio signal over a digital communications network is subject to the terms of the statutory license set forth in 17 U.S.C. § 114(d)(2). *See* Rulemaking at 77301.

## V. District Court Review of Agency Rulemaking

### A. Agency Authority to Interpret the Copyright Act

■ In *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), the Supreme Court recognized that "[t]he power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Id.* (quoting *Morton v. Ruiz*, 415 U.S. 199, 231, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)). When an agency exercises the authority expressly delegated to it by Congress within the limits of the Constitution and its jurisdiction, its determination is "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, —— U.S. ——, ——, 121 S.Ct. 2164, 2171, 150 L.Ed.2d 292 (2001) (citations omitted). The Supreme Court has acknowledged that Congress may also implicitly delegate interpretive authority on a particular statute to an agency. *See id.* at 2172; *Chevron*, 467

U.S. at 844, 104 S.Ct. 2778. The existence of an implicit delegation is apparent in circumstances in which "Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute." *Id.* at 2172.

■ Plaintiffs argue that the Copyright Office lacks the power to determine whether AM/FM streamers are exempt from the section 106 public performance right by section 114(d)(1)(A) because Congress opted not to vest the agency with that authority. (Mem. Opp'n to Defs.' Mot. Dismiss or for Summ. J. ("Pls.' Mem.") at 52.)

The Copyright Act evinces Congress' intent to empower the Copyright Office to interpret the statute. Section 702 provides that "[t]he Register of Copyrights is authorized to establish regulations not inconsistent with law for the administration of the functions and duties made the responsibility of the Register under this title." 17 U.S.C. § 702. Moreover, in *De Sylva v. Ballentine*, 351 U.S. 570, 577–78, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), the Supreme Court acknowledged that it would generally "give weight to the interpretation of an ambiguous statute by [the Copyright Office,] the agency charged with its administration." While the Court declined to rely on the Copyright Office's interpretation of the statute in *De Sylva* because the agency expressed "substantial doubt over the question" before it, the District of Columbia Circuit read *De Sylva* as an indication by the Supreme Court "that it would defer to the Copyright Office when the latter actually interpreted the statute." *Cablevision Sys. Dev. Co. v. Motion Picture Assoc. of Am., Inc.*, 836 F.2d 599, 609 (D.C.Cir.1988).

In *Cablevision*, the court recognized that the agency has greater expertise in matters involving the cable television industry than do the courts. *See id.* at 608. In examining the Copyright Office's au-

thority to interpret section 111 of the Copyright Act, the court of appeals concluded that "[g]iven Congress' awareness of the rapid changes taking place in the cable industry, we cannot believe that Congress intended that there be no administrative overseer of this scheme." *Id.* at 608.

While the District of Columbia Circuit limited its decision to the Copyright Office's interpretation of section 111, I find that Congress similarly delegated interpretative authority to the Copyright Office with regard to section 114. In the context of section 114, Congress' deferral to the Copyright Office to administer the scheme it created demonstrates its recognition of the agency's expertise in this area. Under both the DPRA and the DMCA, the Copyright Office is required to convene voluntary negotiation panels, known as Copyright Arbitration Royalty Panels ("CARPs"), between copyright owners and webcasters to determine the rates and terms for mandatory licensing fees. *See* 17 U.S.C. § 114(f). In overseeing these proceedings, Congress mandated the Copyright Office to minimize "any disruptive impact on the structure of the industries involved and on generally prevailing industry practices." 17 U.S.C. § 801(b)(1)(D). In order to effectively implement Congress' instruction to minimize the disruptive impact on the recording, radio broadcasting, and Internet webcasting industries resulting from the unlicensed use of copyrighted materials, the Copyright Office would need the authority to determine which entities and means of transmission were exempted under the Copyright Act.

Furthermore, the Copyright Office discussed in detail the potential disruption on the CARP process mandated by section 114(f) if it could not determine which entities should be parties to the CARP:

Many broadcasters, and the NAB, have stayed out of the [CARP] proceedings on the grounds that they qualify for the section 114(d)(1)(A) exemption. If these parties are not covered by the exemption ... they should be afforded the opportunity to participate in the CARP proceeding. CARP proceedings are adversarial in nature, making it critical that the interests of all affected copyright owners and users are represented so that the CARP has a full and complete evidentiary record on which to render its determination. Without such information, the CARP cannot render a complete and accurate decision, thereby compromising the efficiency of the section 114 license.

Rulemaking at 77294 (footnote omitted). Thus, the Copyright Office could not exercise its duties and functions without the ability to interpret section 114.

Moreover, it is clear that Congress recognized the expertise of the Copyright Office in matters relating to copyright. *See* 17 U.S.C. § 701(b) (directing the agency to advise Congress on issues relating to copyright, provide assistance to federal departments regarding matters related to copyright, and participate in meetings with international, intergovernmental organizations and foreign officials on matters relating to copyright). Most pertinent here is Congress' requirement that the Copyright Office provide information and assistance to the courts on matters relating to copyright law. *See* 17 U.S.C. § 701(b)(2).

The legislative history also points to congressional intent to use the Copyright Office as an interpreter of copyright law. The Copyright Office played a formative role in implementing legislation such as the DMCA. DMCA co-sponsor Senator Patrick Leahy stated during the final debates on the act:

The DMCA also reflects the recommendations and hard work of the Copyright Office ... The Copyright Office was there at every step along the way—from the negotiation of the WIPO [World Intellectual Property Organization] treaties to the negotiations and the drafting of the implementing legislation and the other issues in the DMCA. Given their expertise in copyright law, they will play a significant role in the implementation of the legislation, particularly with regards to the rulemaking on the circumvention of technological measures that effectively control access to a copyrighted work and the studies mandated by the bill.

*See* 144 Cong. Record 11981 (Oct. 8, 1998).

Accordingly, I conclude that Congress implicitly, if not explicitly, entrusted the Copyright Office with the task of determining which entities and means of transmission would be exempted by section 114 from the public performance rights of section 106.

Relying on *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000), Plaintiffs argue that it is unlikely that Congress would implicitly delegate an area of so large a "political and economic magnitude" to a government agency (Pls.' Mem. at 15.) I respectfully disagree. In *Brown & Williamson*, the Supreme Court concluded that the FDA lacked the authority to regulate tobacco products because, upon consideration of the Food, Drug, and Cosmetic Act as a whole, it was "clear that Congress intended to exclude tobacco products from the FDA's jurisdiction." *Id.* at 142, 161, 120 S.Ct. 1291. The Court noted that in "extraordinary cases ... there may be reason to hesitate before concluding that Congress has intended [ ] an implicit delegation," *id.* at 159, 120 S.Ct.

1291, because an agency "may not exercise its authority in a manner that is inconsistent with the administrative structure that Congress enacted into law." *Id.* at 125, 120 S.Ct. 1291. The circumstances of the instant case are not analogous to those in *Brown & Williamson*. Here, Congress did not express a similar intent to exclude interpretation of section 114 from the jurisdiction of the Copyright Office. Furthermore, the Copyright Office's Rulemaking is not inconsistent with the congressional enactment at issue here and therefore does not constitute the type of "extraordinary" situation in which implicit delegation should not be found. Thus, Plaintiffs' argument is unavailing.

**B. Judicial Deference Owed to Agency Interpretations**

In *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778, the Supreme Court pronounced a two-pronged inquiry for use in determining whether an agency action is entitled to judicial deference. First, the court is directed to ascertain whether Congress has directly addressed the precise issue before it. *See id.* at 842, 104 S.Ct. 2778. If Congress' intent is "unambiguously expressed," the court's evaluation ends, as it must simply give effect to that intent. *Id.* at 843, 104 S.Ct. 2778. If, however, "the statute is silent or ambiguous with respect to the specific issue," the court is to proceed to the second part of the inquiry and determine "whether the agency's answer is a reasonable one based on a permissible construction of the statute." *Id.* at 843–45, 104 S.Ct. 2778. *See also United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 263 (3d Cir.1992) (holding that "[an agency's] interpretation of the statute it is charged with enforcing is entitled to considerable deference, and must be adhered to where it is reasonable and consistent with the

language of the statute.").[11]

## VI. Congressional Silence on Exemption of AM/FM Streamers

■ Under the standard set forth by *Chevron,* I must first examine whether Congress directly addressed the issue of whether FCC-licensed AM/FM broadcasters engaged in streaming are exempted from the public performance right in section 106 of the Copyright Act. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778. If Congress has directly addressed the precise question at issue I must give effect to its unambiguously expressed intent. *See id.* I begin with an examination of the statutory text in its context, *see Brown & Williamson,* 529 U.S. at 132, 120 S.Ct. 1291, keeping in mind my obligation to construe statutory exemptions narrowly. *See Tasini v. New York Times Co.,* 206 F.3d 161, 168 (2d Cir.2000), *aff'd,* — U.S. ——, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001).

Section 114(d)(1)(A) sets out an exemption to the public performance right of section 106 for "a nonsubscription broadcast transmission." 17 U.S.C. § 114(d)(1)(A). Section 114(j) defines a "nonsubscription transmission" as "any transmission that is not a subscription transmission." 17 U.S.C. § 114(j)(5). A "subscription" transmission is defined as "a transmission that is controlled and limited to particular recipients, and for which consideration is required to be paid or otherwise given by or on behalf of the recipient to receive the transmission or a package of transmissions including the transmission." 17 U.S.C. § 119(j). A "broadcast transmission is defined as a transmission made by a terrestrial broadcast station licensed as such by the [FCC]." 17 U.S.C. § 114(j)(2).

Plaintiffs assert that the statute on its face exempts AM/FM broadcasters engaged in streaming their broadcasts from the public performance right. *See* Compl. at 11. According to the Plaintiffs, section 114(d)(1)(A) makes clear Congress' scheme to exempt from liability nonsubscription broadcast transmissions, whether those transmissions are made over-the-air or over a digital communications network. I disagree.

Plaintiffs argue that an AM/FM broadcaster streaming its broadcast over the Internet clearly falls into the category of one engaging in a "nonsubscription broadcast transmission." First, the streaming of an AM/FM broadcast is not a subscription broadcast, because the transmission is not limited to particular recipients and consideration is not required to be paid in order to receive the transmission. (Pls.' Mem. at 12.) Plaintiffs also contend that because a broadcast transmission is defined as a transmission made by a terres-

---

11. Plaintiffs also attack the agency for its purported bias to the recording industry, claiming bias to be a persuasive ground for depriving the Copyright Office of *Chevron* deference. Plaintiffs, notably, have not cited any authority to support their contention. To the contrary, the Supreme Court was well aware of the problem of agency "capture," that is, an agency's susceptibility to the influence and control of the industry Congress charged the agency to regulate. During the 1960s and 1970s, the courts checked agencies by the very mechanism plaintiffs urge here—they "used statutory interpretation to try to correct for agency capture." Thomas W. Merrill, *Capture Theory and the Courts: 1967–1983,* 72 CHI.-KENT L.REV. 1039, 1087 (1997). However, fear of agency capture diminished, and *de novo* review of agency statutory interpretation came to a "crashing end" with *Chevron. Id.* at 1088. The triad of reasons supporting *Chevron*—conscious congressional reliance on agency expertise, lack of foresight by Congress to address all issues, and Congressional silence viewed as reflecting political indecision outweigh any existing fear of agency capture. *See id.* (citing *Chevron,* 467 U.S. at 865, 104 S.Ct. 2778).

trial broadcast station licensed as such by the FCC, and because these AM/FM broadcasters are both terrestrial [12] and licensed by the FCC, the statute specifically exempts AM/FM broadcasters streaming their broadcasts. *See id.*

RIAA argues that the plain reading of the term "broadcast" in section 114(d)(1)(A) is reinforced by the "long-settled understanding" that a broadcast does not involve a point-to-point communication, unlike an Internet transmission. (RIAA Mot. Supp. Mot. Dismiss or for Summ. J. at 10.) While a traditional over-the-air transmission by an AM/FM broadcaster qualifies for the 114(d)(1)(A) exemption because it runs one-way only (without a responsive transmission by the listener), is disseminated free of charge, and is "broadcast" in the open air, for all to receive. Streaming, on the other hand, is not a broadcast because it involves a signal transmitted over closed transmission lines to the specified addresses of individual computers in response to their searching out and "hitting" on the transmitter's website. *Id.*

The Copyright Office argues that use of the terms "terrestrial" and "licensed as such by the [FCC]" in the relevant sections of the Copyright Act show that the 114(d)(1)(A) exemption to the public performance right cannot be intended to encompass AM/FM broadcasters engaged in streaming. According to the agency, the term "terrestrial" refers to local radio stations, grounded by broadcast antennae, and thereby limited to a defined geographic region. (Copyright Office Mem. at 22.) The agency claims that the fact that web-

casting signals are made by computer and instantly relayed anywhere in the world through a network of different servers and smaller networks, most of which have no relationship with the entity creating the signal, takes AM/FM broadcasters engaged in streaming out of the category of "terrestrial broadcast station." *See id.* at 22.

The Copyright Office also argues that the phrase "licensed as such by the [FCC]" refers to more than just the fact that AM/FM broadcasters are licensed by the FCC. According to the agency, the phrase, in addition to identifying the entity entitled to make a broadcast transmission, circumscribes which actions the station may undertake under the section 114 exemption. *See id.* at 23. The agency notes that FCC licensing is a highly regulatory process focused on ensuring that broadcasters are providing a public service to the local communities they serve.[13] *See id.*

While the common understanding of the term "broadcast" may not encompass AM/FM streaming, as RIAA suggests, the definition of the term "broadcast" appears broad enough to encompass streaming activities. However, Congress' choice not to exempt webcasting from the public performance right of section 106, *see* 17 U.S.C. § 114(d)(2), is problematic to Plaintiffs' reading of the statute. It is strange that Congress would choose not to exempt webcasting, but choose to exempt AM/FM streaming, an activity that shares many characteristics with webcasting. Furthermore, if Congress did intend to have AM/FM streaming understood as a "nonsubscription broadcast transmission," it is

---

12. Plaintiffs assert that Congress intended the term "terrestrial" to distinguish earth-bound stations from those involved in transmitting satellite transmissions. (Pls.' Reply Mem. at 6).

13. The rigorous requirements of FCC licensing stand in stark contrast to the relatively lax regulations governing webcasting, in which no license is required and no programming restrictions apply. (Copyright Office Mem. at 23.)

even more surprising that there is no mention of AM/FM streaming anywhere in the statute.

Even more problematic to Plaintiffs' interpretation of the statute is the presence of the phrase "licensed as such by the [FCC]" within the definition of a "broadcast transmission." 17 U.S.C. § 114(j)(2). It is true that AM/FM broadcasters engaged in streaming their broadcasts over the Internet are licensed by the FCC. However, the presence of the term "licensed as such by the [FCC]" suggests not only that a broadcast station is licensed by the FCC, it implies that the broadcast station is engaging in those activities which are licensed by the FCC. The idea that Congress intended FCC-licensed entities to be exempt from the public performance right while engaging in activities the FCC does not regulate, without some explicit reference in the statute stating so, is extremely unlikely. Therefore, I find a facial reading of the statute to be ambiguous as to the question of whether AM/FM streaming is exempt from the public performance right of section 106 of the Copyright Act.

The Copyright Office and RIAA also note that reading the statute as the plaintiffs urge would create several conflicts with other sections of the Copyright Act, making such an interpretation inconsistent with the goal of reading the Copyright Act as a harmonious whole. (Copyright Office Mem. at 27.) First, exempting AM/FM broadcasters from the section 106 public performance right would conflict with the retransmission limits of section 114(d)(1)(B). Section 114(d)(1)(B) allows for the retransmission of over-the-air broadcasts if the retransmission remains within 150 miles of the site of the original radio broadcast transmitter, is limited to local communities served by the retransmitter, or is carried by a noncommercial educational broadcast station or cable system. *See* 17 U.S.C. § 114(d)(1)(B).

I find the existence of the section 114(d)(1)(B) exemptions to be inconsistent with a reading of section 114(d)(1)(A) which would exempt AM/FM broadcasters streaming their broadcasts from the public performance right of section 106. It strains credulity to suggest that Congress intended to exempt AM/FM streaming, which is global in nature, while simultaneously limiting retransmissions to specific FCC-defined geographic areas. While Plaintiffs have argued that the 114(d)(1)(B) exemptions are intended to apply to "third-party retransmissions," and not streaming conducted by original AM/FM broadcasters (Pls.' Mem. at 36), such an argument is not convincing. First, there is no explicit mention of "third parties" in section 114(d)(1)(B). *See* 17 U.S.C. § 114(d)(1)(B). Second, no convincing reason has been presented to the court as to why Congress would have wanted to limit third-party retransmissions, but not retransmissions effected by the original AM/FM broadcaster. Plaintiffs contend that because section 114(d)(1)(B) limits *retransmissions* of AM/FM broadcasts, it was not intended to apply to *simultaneous* transmissions by the original AM/FM broadcaster. However, nothing in the statute points toward a conclusion that a retransmission could not occur simultaneously with the original AM/FM over-the-air broadcast. *See* 17 U.S.C. § 114(d)(1).[14]

---

**14.** Plaintiffs note that because a "transmission" is expressly defined in the Copyright Act to include "either an initial transmission or a retransmission," 17 U.S.C. § 114(j)(15), it is of little import whether the streaming of an over-the-air broadcast is considered a retransmission or a transmission. (Pls.' Mem. at 39 n. 27.) While Plaintiffs are correct that under the statute a "retransmission" would also be categorized as a "transmission," because I

Defendants also note the conflict that would arise with the ephemeral recording rights of section 112, if section 114(d)(1)(A) were to be read as exempting AM/FM broadcasters. Section 112(a)(1)[15] allows FCC-licensed broadcast radio stations to make one ephemeral copy of a copyrighted work in order to facilitate transmissions within its local service area. *See* 17 U.S.C. § 112(a)(1).[16] While Plaintiffs claim that the "local service area" of a webcaster is the entire world (Pls.' Mem. at 48–49), Defendants contend that the term "local service area" necessarily "limits the geographic reach of the signal and makes clear that it is not subject to worldwide distribution." (Copyright Office Mem. at 47.)

The use of the term "local service area" in section 112(a)(1) is inconsistent with the reading of section 114(d)(1)(A) that Plaintiffs propose. It is not disputed that the streaming of an AM/FM broadcast is a transmission that instantaneously reaches almost anywhere in the world. The term "local service area," used to refer to an area that is global in scope, would be unusual to say the least. Certainly, on its face, the term would appear to relate to something that is less-than-global in scope. The term "local service area" in conjunction with the words "licensed as such by the [FCC]," 17 U.S.C. § 112(a)(1), suggests even more strongly that a "local service area" could not be global in scope. As noted above, FCC-regulated broadcast stations are heavily regulated and limited to broadcasts made within an FCC-defined local service area. It is most likely that

the term "local service area" used in section 112(a)(1)(B) refers to the FCC-defined local service area of any FCC-licensed broadcast station. If Congress had intended the section 112 ephemeral recording provisions to cover AM/FM streaming over the Internet, it would have either referred to its intention to do so explicitly in section 112, or possibly referred to the area reached by streaming transmissions merely as a "service area" as opposed to a "local service area." However, the presence of the phrase "local service area" in section 112 leads to one of two conclusions, either: (1) the section 114(d)(1)(A) exemption was intended not to encompass the Internet streaming of AM/FM broadcasts; or (2) Congress failed to even consider the issue of Internet streaming of AM/FM broadcasts when revising the Copyright Act in 1995 and 1998, accounting for inconsistencies in the statute.

Given the ambiguity presented by a facial reading of the Copyright Act as to whether the section 114(d)(1)(A) exemption encompasses AM/FM broadcasters engaged in streaming their broadcasts, as well as the conflicts with other sections of the Copyright Act if section 114 were to be read as the Plaintiffs urge, absent some clear statement from Congress that it intended to exempt AM/FM streaming from the section 106 public performance right, it is impossible to conclude that Congress directly spoke to the precise question of AM/FM streaming. Furthermore, the legislative history is devoid of any mention of streaming of AM/FM broadcasts.

---

have already found that the statute is unclear as to whether the streaming of an over-the-air broadcast by an AM/FM broadcaster constitutes a "nonsubscription broadcast transmission," this argument becomes moot.

**15.** *See supra* note 7.

**16.** As noted above, the "ephemeral copy exception" to the public performance right of section 206 enables broadcasters to make one copy of a copyrighted recording to facilitate a broadcast. The copy is destroyed after the broadcast is effected. *See* 17 U.S.C. § 112; *supra* section III.B.

Plaintiffs also rely on legislative history to establish that Congress intended to exempt AM/FM streaming from the public performance right with section 114(d)(1)(A). The Senate Report accompanying the enactment of the DPRA in 1995 which created a limited public performance right states:

> The Committee, in reviewing the record before it and the goals of this legislation, recognizes that the sale of many sound recordings and careers of many performers have benefitted considerably from airplay and other promotional activities provided by both noncommercial and advertiser-supported, free over-the-air broadcasting. The Committee also recognizes that the radio industry has grown and prospered with the availability and use of prerecorded music. *This legislation should do nothing to change or jeopardize the mutually beneficial economic relationship between the recording and traditional broadcasting industries.*

1995 Senate Report at 16 (emphasis added).

The fact that the original limited public performance right that was created in 1995 was not intended to upset the mutually beneficial relationship between recording and traditional broadcast industries does little to support the Plaintiffs' reading of the Copyright Act. While it is true that broadcasters traditionally have not been subject to any public performance right for using a recording in an AM/FM broadcast, the streaming of broadcasts over the Internet is not part of the traditional practices of AM/FM broadcasters which form the basis of their traditional relationship with the recording industry. Internet streaming by AM/FM broadcasters is entirely different from traditional over-the-air broadcasting because it is global in nature, as opposed to being limited to geographically defined areas, and because the digital nature of the transmissions, as opposed to the analog nature of traditional over-the-air broadcasts, significantly enhances the ability to create high-quality copies from the transmissions. The global nature and the enhanced quality of the transmissions increase the likelihood that record sales could be affected by the streaming of AM/FM broadcasts.

The limited public performance right of section 106, *see* 17 U.S.C. § 106, was created "to ensure that performing artists, record companies and others whose livelihood depends upon effective copyright protection for sound recordings, will be protected as new technologies affect the ways in which their creative works are used ..." 1995 Senate Report at 10; 1995 House Report at 10. When the Copyright Act was again amended in 1998 with the DMCA, the purpose was to clarify that "the digital sound recording performance right applies to nonsubscription digital audio services such as webcasting, addresses unique programming and other issues raised by Internet transmissions, and creates statutory licensing to ease the administrative and legal burdens of constructing efficient licensing systems." House Manager's Report at 50.[17] Both of these pieces

---

17. The Plaintiffs have attempted to depict AM/FM streaming as different from "webcasting" because it involves nonsubscription transmissions which are generated by FCC-licensed broadcasters who are subject to the strict regulations promulgated by the FCC. The Defendants assert that AM/FM streaming is similar to webcasting because it involves Internet transmissions which are both global in scope and digital in form, enabling high-quality copying by an extremely large audience. While AM/FM streaming, due to the potential harm it could have on record sales, is more similar to webcasting than it is to over-the-air broadcasting, the fact that AM/FM stations are subject to limitations im-

of legislative history show a concern on the part of Congress to protect record companies and recording artists from the danger of reduced record sales due to technological advances enabling high-quality copying by a large number of listeners. Given such a concern on the part of Congress, as well as a conspicuous absence of any explicit mention of AM/FM streaming anywhere in the legislative history of either the DPRA or the DMCA, it is impossible for me to conclude that Congress intended to exempt AM/FM streaming from the public performance right of section 106.

Accordingly, I conclude that Congress did not directly address the issue of whether AM/FM broadcasters engaged in streaming their broadcasts over the Internet should be exempt from the section 106 public performance right. The statute is either silent, or, at best, ambiguous on the issue before me. *See Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. The Copyright Office was thus entitled to engage in a Rulemaking, and I am required to defer to the agency's determination if it is a reasonable one. *See Chevron*, 467 U.S. at 845, 104 S.Ct. 2778.

## VII. The Copyright Office's Rulemaking was Reasonable

█ After a thorough examination of the section 114(d)(1)(A) exemption and after receiving numerous comments from various interested parties, the Copyright Office determined that the section 114(d)(1)(A) exemption was not intended to

encompass AM/FM webcasting.[18] Therefore, the Copyright Office amended its regulatory definition of a "Service" "to clarify that transmissions of broadcast signals over a digital communications network, such as the Internet, are not exempt from copyright liability under section 114(d)(1)(A) of the Copyright Act." *See* Rulemaking at 77292. For the reasons set forth below, I find that the agency's Rulemaking is not just reasonable, but that it reaches the same conclusion as I would in the absence of *Chevron* deference to the Copyright Office.

Parties on both sides of the issue before the Copyright Office argued that the statutory language and licensing scheme, the legislative histories of the DPRA and the DMCA, as well as public policy considerations supported their respective positions. *See* Rulemaking at 77296. The agency thus fully examined each of the arguments of the parties in coming to its final decision.

### A. The Copyright Office's Statutory Analysis

First, the Copyright Office analyzed the language of the Copyright Act and determined that the term "nonsubscription broadcast transmission" was not intended to include AM/FM webcasting. The agency determined that the statute is ambiguous on its face, entitling it to look at legislative history and other signs of con-

---

posed by the FCC makes AM/FM streaming different from what Congress originally referred to as "webcasting." The unique aspects of AM/FM streaming combined with an ambiguous, conflicting statute, as well as no reference by Congress regarding AM/FM streaming, is overwhelming evidence that Congress did not address the issue of whether AM/FM streamers should be exempted from the section 106 public performance right by section 114(d)(1)(A).

18. While I have referred to the issue at bar as one of AM/FM broadcasters engaged in streaming their broadcasts over the Internet, or simply AM/FM streaming, the Copyright Office refers to the same activity as "AM/FM webcasting." (Copyright Office Mem. at 1). The terms are interchangeable in this opinion.

gressional intent in interpreting the statute. *See* Rulemaking at 77298.

The broadcasters argued before the Copyright Office that "any transmission made by a terrestrial broadcast station licensed by the FCC, whether disseminated over-the-air or transmitted over the Internet, fits the statutory definition of a 'nonsubscription transmission.'" Rulemaking at 77297. The copyright owners and DiMA disagreed with the broadcasters and focused instead on use of the word "terrestrial," and use of the phrase "licensed as such by the FCC." *See id.* The copyright owners and DiMA argued that the use of the phrase "licensed as such by the FCC" reflects Congressional intent to limit the exemption to activities for which a broadcast station is required to have an FCC license. *See* Rulemaking at 77297. In arguing that the term "terrestrial" limits the exemption to over-the-air transmissions by radio stations, they pointed to legislative history such as the following passage, which makes clear Congress' intent to exempt traditional over-the-air transmissions:

> [F]ree over-the-air broadcasts are available without subscription, do not rely on interactive delivery, and provide a mix of entertainment programming and other public interest activities to local communities to fulfill a condition of the broadcasters' license. The committee has considered these factors in concluding *not* to include free over-the-air broadcast services in the legislation.

1995 House Report, at 13.

The Copyright Office found that AM/FM webcasting is not conducted by "terrestrial broadcast stations." *See* Rulemaking at 77297. While local radio stations are terrestrial in that they are literally grounded by their broadcast antennae and thereby limited to a geographic area, webcasts are made by computer transmitters which re-

lay signals anywhere in the world, and are therefore not made by "terrestrial broadcast stations." *See id.* According to the agency, the fact that the same entity might own the antenna executing the over-the air broadcast as well as the computer streaming the broadcast over the Internet would not render the webcast *performed* by a terrestrial station. *See id.*

The agency also found that use of the phrase "licensed as such by the [FCC]" referred to more than the designation of a particular entity. *See id.* at 77298. Agreeing with the copyright holders, the Copyright Office noted that "Congress appears to have chosen these words not only as a convenient way in which to identify the entity entitled to make a broadcast transmission, but also as a way to circumscribe which actions the entity may legally undertake within the scope of the section 114 exemption." *Id.* The agency concluded that the phrase "licensed as such by the [FCC]" referred to a particular type of activity and a particular type of transmission, namely over-the-air broadcasting, and not the nature of the transmitting entity. *See id.*

The Copyright Office also examined other sections of the legislative history surrounding the passage of the DPRA and concluded that it was "abundantly clear that Congress meant to protect traditional over-the-air broadcast transmissions." Rulemaking at 77297. First, the agency noted that the exemption was enacted prior to the advent of AM/FM webcasting and that Congress at that time most likely did not foresee such activity. *See id.* at 77296. The Copyright Office relied on statements made in Congress during the passage of the DMCA noting that "at the time the [DPRA] was crafted, Internet transmissions of music were not the focus of Congress' efforts." Staff of the House of Representatives Comm. On the Judicia-

ry, 105th Cong., 2d Sess., Section–by–Section Analysis of H.R 2281 as Passed by the United States House of Representatives on August 4, 1998 at 51 (Comm. Print, Serial No. 6, 1998).[19]

In addition, the agency noted that Congress used the term "over-the-air" to identify those broadcasts it sought to exempt from the public performance right, and made no mention of any other type of transmission made by an FCC-licensed broadcaster. *See id.* at 77298. Also, "[t]he use of the descriptive phrase 'terrestrial broadcast station licensed as such by the [FCC]' involves much more than the mere designation of a particular entity." *Id.* at 77298. According to the Copyright Office, Congress chose the phrase not only as a way in which to describe the entity entitled to make a broadcast transmission, but also as "a way to circumscribe which actions the entity may legally undertake within the scope of the section 114 exemption." *See* Rulemaking at 77298.

I find the agency's determinations regarding the legislative intent to be reasonable. Moreover, were I approaching this question without the benefit of a Copyright Office Rulemaking and therefore, without the need to defer to a reasonable agency determination under *Chevron,* I would come to the same conclusion. Both the ambiguity that emerges from a facial reading of the statute as well as the legislative history of both the 1995 and 1998 amendments to the Copyright Act show that it is highly unlikely that Congress even consid-

ered AM/FM streaming, much less intended to exempt such activities from the section 106 public performance right.

**B. Conflicts with Other Sections of the Copyright Act**

The Copyright Office found that reading the 114(d)(1)(A) exemption to include streaming of AM/FM broadcasting would conflict with other provisions of both the DPRA and the DMCA. Sections 114(d)(2)(B) and (C) offer exemptions from the digital performance right for certain retransmissions of audio signals. 17 U.S.C. § 114(d)(2)(B), (C). Section 114(d)(1)(B) allows the retransmission of an over-the-air radio broadcast where the retransmission remains within a 150–mile radius from the site of the original radio broadcast transmitter, is limited to local communities served by the retransmitter, or is carried by a noncommercial educational broadcast station or by a cable system. *See* 17 U.S.C. § 114(d)(1)(B). Section 114(d)(1)(C) exempts transmissions within business organizations, incidental transmissions, and transmissions made to deliver licensed programming to the user. *See* 17 U.S.C. § 114(d)(1)(C).

According to the Copyright Office, limited exemptions such as those in 114(d)(1)(B) and (C) show that Congress intended to exempt only local retransmissions of over-the-air radio broadcasts, thereby undermining any claim that an FCC-licensed broadcaster engaged in streaming its broadcasts is immediately

**19.** The Plaintiffs in the case before me have challenged this determination by the agency, claiming that at least 50 AM/FM stations were engaged in streaming their over-the-air broadcasts in 1995, at the time the DPRA was enacted. (Pls.' Mem. at 27.) Plaintiffs' reliance on one particular statement made by someone not involved in the legislative process is not convincing when faced with multiple statements supporting the agency's deter-

mination that Congress was not thinking of AM/FM webcasting when it enacted both the DPRA and the DMCA. This is especially true because the relevant question in interpreting legislative intent in this case is not whether the AM/FM webcasting was occurring in 1995, or even in 1998, but whether Congress was aware of such a phenomenon and chose to address it.

and totally exempt. *See* Rulemaking at 77298. First, the only exception to the 150–mile limit on retransmissions is for a "terrestrial broadcast station, terrestrial translator or terrestrial repeater licensed by the [FCC]." 17 U.S.C. 114(d)(1)(B)(i)(I). The Copyright Office found that the fact that the entity making the transmission must be licensed by the FCC placed limits upon the geographic area within which the retransmission can reach, and the FCC-limited area could in no case be global. *See* Rulemaking at 77299. Second, the Copyright Office found that there was no support anywhere in the statute for the proposition that section 114(d)(1)(B) referred only to third-party transmissions.

The Copyright Office also found that reading section 114(d)(1)(A) to exempt AM/FM broadcasters from the digital performance right would conflict with the Act's ephemeral recording provisions in section 112. *See* 17 U.S.C. § 112. Under the section 112(a)(1) exemption,[20] the digital reproduction right is not infringed when, in the course of a nonsubscription broadcast transmission in digital format, "a transmitting organization that is a broadcast radio or television station ... make[s] no more than one copy" of the transmission program embodying the performance, so long as the so-called ephemeral copy is "used solely for the

transmitting organization's own transmission within its local service area." 17 U.S.C. § 112(a)(1)(B). According to the agency, the use of the term "local service area" limits the reach of the signal, making the worldwide distribution made possible by Internet streaming incompatible with the 112(a)(1) exemption. *See* Rulemaking at 77299.

The agency noted that because an AM/FM broadcaster engaged in streaming its broadcast over the Internet would not be eligible for the 112(a)(1)(B) exemption, it would have to depend upon a *statutory* license under section 112(e) in order to make ephemeral copies. However, because the section 112(e) ephemeral copy license is available only to those eligible for a section 114(f) statutory license and is not available to those publicly performing a sound recording under the section 114(d)(1)(A) exemption, an AM/FM broadcaster streaming its broadcast over the Internet would not be able to obtain a section 112(e) ephemeral copy license. The Copyright Office concluded that because an AM/FM webcaster would not be able to make ephemeral copies, section 114(d)(1)(A) must be read not to exempt AM/FM webcasting. *See id.*

This part of the agency's Rulemaking is extremely convincing. Not only is it a reasonable conclusion, but it is virtually the only conclusion one could arrive at

---

**20.** Section 112 states:

(a)(1) Notwithstanding the provisions of section 106, and except in the case of a motion picture or other audiovisual work, it is not an infringement of copyright for a transmitting organization entitled to transmit to the public a performance or display of a work, under a license, including a statutory license under section 114(f), or transfer of the copyright or under the limitations on exclusive rights in sound recordings specified by section 114(a) or for a transmitting organization that is broadcast radio or television station licensed as such

by the Federal Communications Commission and that makes a broadcast transmission of a performance of a sound recording in a digital format on a nonsubscription basis, to make no more than one copy or phonorecord of a particular transmission program embodying the performance or display, if ...

(B) the copy or phonorecord is used solely for the transmitting organization's own transmission within its local service area,

...

17 U.S.C. § 112(a)(1)(B).

after a contextual reading of the statute in an attempt to read it as a harmonious whole. The idea that AM/FM webcasters would be exempt from the public performance right, while section 114(d)(1)(B) carefully limits exemptions on certain transmissions made by AM/FM broadcasters, strains reason. Similarly, the idea that AM/FM webcasters could be exempt from the public performance right without being granted the right to make "ephemeral copies" under section 112 defies any rational contextual reading of the statute. Once again, were I to examine this issue in the absence of a Copyright Office Rulemaking, I would find that the conflicts inherent in the statute overwhelmingly support the proposition that if Congress had addressed this precise issue of law, it would have chosen not to exempt AM/FM webcasters from the section 106 public performance right.

## C. Policy Considerations

The Copyright Office found that public policy considerations militated in favor of finding that the section 114(d)(1)(A) exemption does not apply to AM/FM broadcasters engaged in webcasting. The copyright owners argued before the Copyright Office that it was illogical to permit broadcasters to stream under an exemption but impose liability on a third party when it retransmits the very same programming. They also argued that nothing in either the DPRA or the DMCA suggests that the right to compensation on the part of a copyright owner should depend on whether the transmission is made by the broadcaster, or the broadcaster's agent. DiMA argued that by allowing broadcasters to stream programming over the Internet, broadcasters would get a free pass to engage in the same activity which the DPRA was enacted to counter. *See* Rulemaking at 77300.

The Broadcasters claimed that just as radio broadcasts on a local scale benefit the recording industry through the promotion of sales, that same broadcasting activity is even more beneficial to the recording industry on a global scale due to the greater public exposure. *See id.* The Broadcasters also argued that Congress intended to exempt AM/FM broadcasters because they "comply with FCC content requirements to promote the public interest and serve the local community," and generally program only a single channel, unlike the multi-channel services usually offered by many Internet music providers. *Id.* at 77301.

The Copyright Office found that permitting AM/FM broadcasters to webcast their radio broadcasts without restrictions would be the equivalent of giving them an unfair advantage in the webcasting market. Because in enacting both the DPRA and the DMCA, Congress was concerned with protecting against the dangers webcasting posed to the rights of copyright holders, and because AM/FM stations engaged in webcasting posed those same dangers, there was no legitimate reason to create such a disparity in the webcasting market. *See id.* The agency also dismissed the Broadcasters' reading of the statute, under which the section 114(d)(1)(A) exemption turns entirely on the party doing the webcasting. *See id.* Finally, the agency found that the ability to greatly expand the scope of AM/FM broadcasts through Internet streaming was incompatible with the stated goal of preserving the existing relationship between the two industries. *See id.*

The agency then determined that the definition of a "broadcast transmission" includes only over-the-air broadcasts made by an FCC-licensed broadcaster under the terms of that license. *See id.* at 77301. The result of the Copyright Office's deter-

mination is to allow for the transmission of an over-the-air broadcast, whether it be in analog or digital format as long as the broadcast is limited to the geographically-defined areas determined by the FCC. However, all other digital transmissions made by nonsubscription, noninteractive services are subject to the statutory license, in order to compensate recording companies for the risk of lost sales due to the possibility that a listener may make a high quality unauthorized copy directly from the transmission. *See id.* The Copyright Office therefore amended the definition of "Service" to reflect the determination that an entity that transmits an AM/FM radio signal over a digital communications network is subject to the statutory license set forth in 17 U.S.C. § 114(d)(2). *See* Rulemaking at 77301.

Once again, I find the Copyright Office's public policy findings to be both supported by substantial amounts of documentation and certainly reasonable. Were I considering the issue of whether section 114(d)(1)(A) exempts AM/FM webcasters, free of the restraints placed on me by *Chevron,* I would come to the same conclusion. The policy of protecting copyright holders from the dangers of reduced sales from the enhanced copying capabilities of digital transmissions over the Internet simply adds even more support to the already convincing evidence that Congress did not intend to exempt AM/FM webcasters which emerges from a careful contextual reading of the statute, as well as its legislative history. I can only conclude that Congress did not intend to exempt AM/FM webcasters from the section 106 public performance right.

Accordingly, I find that the Copyright Office's Rulemaking more than meets the requirement of reasonableness set out by *Chevron.* The determination that the section 114(d)(1)(A) exemption does not ex-

empt AM/FM broadcasters engaged in streaming their broadcasts from the section 106 public performance right, as well as the amendment of the definition of the term "Service" to conform with such an understanding, is not only reasonable, but also the only determination the Copyright Office could arrive at after a full and fair examination of the statute, its legislative history, and congressional intent in amending the Copyright Act.

## VIII. Conclusion

More than 80 years ago, station KDKA of Pittsburgh became the first commercial radio station in the United States. Since that modest beginning, radio broadcasters can now reach a listener with a computer anywhere on earth. While technology has increased exponentially in the last 20 years, Congress has relied on and vested in the Copyright Office certain powers to grapple with the ever-evolving technological landscape. It is this interplay between Congress and the Copyright Office which must set the guidelines. As much as possible, courts should be passive players in this quickly changing area, only weighing in when the impasses raise issues of constitutional proportion, or decisions are without any statutory authority or so arbitrary that court intervention is required.

It is possible that Congress might some day choose to address the issue of whether AM/FM streaming should be exempt from the section 106 public performance right by amending the Copyright Act, as it has done several times in the past decade and in so doing, Congress, in its wisdom, might choose to exempt AM/FM streaming as the Plaintiffs in this case urge. However, as Judge Learned Hand aptly noted almost 60 years ago, it is not "desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time but

whose birth is distant." *Spector Motor Serv., Inc. v. Walsh,* 139 F.2d 809, 823 (2d Cir.1943) (Hand, J. dissenting), *vacated,* 323 U.S. 101, 65 S.Ct. 152, 89 L.Ed. 101 (1944).

Furthermore, copyright law is an issue which the framers of the Constitution thought important enough to address in the document which sets out the framework of our legal system. *See* U.S. Const. art. I, § 8 cl. 8. The importance of guaranteeing secure copyrights has been with this nation since its earliest years. The seriousness with which courts should approach any weakening of copyright protections stems from the fact that copyright law is not "a tax on creativity," as Lord Macaulay once branded it, Thomas B. Macaulay, Speech before the House of Commons (Feb. 5, 1841) in VIII THE WORKS OF LORD MACAULAY 195, 201 (Trevelyan, ed. 1879), but a complex system designed to benefit not just the holders of copyrights but society as a whole. *See* Jane C. Ginsburg, *Authors and Users in Copyright,* 45 J. Copyright Soc'y U.S.A. 1 (1997), at 4–5. "Copyright is a law about creativity; it is not, and should not become, merely a law for the facilitation of consumption." *Id.*

For the reasons set forth above, I grant Defendants' Motions for Summary Judgment. An Order follows.

### ORDER

AND NOW, this 1st day of August, 2001, upon consideration of the Defendants' Motions for Summary Judgment and any responses thereto:

1. It is ORDERED that Defendants' Motions for Summary Judgment are hereby GRANTED.

2. It is ORDERED that this case is hereby DISMISSED WITH PREJUDICE.

3. All other Motions (including docket nos. 0–1, 15–1, 17–1 and 23–1) are hereby DISMISSED AS MOOT.